**In re Edward J. SHOEN, Debtor.**

**In re James P. SHOEN, Debtor.**

**In re Aubrey K. JOHNSON, Debtor.**

**In re John M. DODDS, Debtor.**

**In re William E. CARTY, Debtor.**

Bankruptcy Nos. 95–1430–PHX–JMM, 95–1431–PHX–JMM, 95–1432–PHX–CGC, 95–1433–PHX–RGM and 95–1434–PHX–GBN.

United States Bankruptcy Court, D. Arizona.

March 4, 1996.

**304**

Lowell Rothschild, Michael McGrath, Tucson, AZ, for debtor William Carty.

Richard Amoroso, U–Haul Intl, Inc., Phoenix, AZ, for AMERCO (in-house counsel for AMERCO).

Gil Shaw, Law Offices of Gil Shaw, Phoenix, AZ, Taylor C. Ashworth, Phoenix, AZ, for Share Case Plaintiffs, as a group.

Robert Hackett, David Dow, Mohr Hackett Pederson, Blakley, Randolph & Haga, P.C., Phoenix, AZ, for AMERCO.

Michael L. Shoen, Phoenix, AZ, pro se.

L.S. Shoen, Las Vegas, NV, pro se.

Marc Rappel, Latham & Watkins, Los Angeles, CA, Michael Ahrens, Bronson, Bronson & McKinnon, San Francisco, CA, Bret Maidman, Lewis & Roca, Phoenix, AZ, for debtor Paul Shoen.

John J. Dawson, Susan G. Boswell, Ronald Reinsel, Streich Lang, P.A., Tucson, AZ, for debtors Edward "Joe" Shoen, James Shoen, Aubrey Johnson and John Dodds.

## AMENDED MEMORANDUM DECISION RE: PLAN CONFIRMATION

JAMES M. MARLAR, Bankruptcy Judge:

### I. *INTRODUCTION.*

The currently proposed chapter 11 plans of reorganization represent the latest sad chapter in a lengthy struggle relating to the troubles, and desire for ultimate control, of publicly-held corporate giant AMERCO, Inc., and its principal subsidiary, U–Haul International, Inc. In order to understand the current controversy, the court must set the stage by restating certain historical information which was gleaned from the court's files and comments of the parties. However, such information was not considered in rendering this decision.[1] This story begins in the years following World War II, when Leonard Samuel Shoen ("L.S.") founded the U–Haul company by constructing and renting trailers. L.S. worked hard, and had a vision which ultimately blossomed into a multi-million dollar company. The parent company of the organization is now known as AMERCO, a Nevada corporation ("AMERCO"), and U–Haul International, Inc. ("U–Haul") is its subsidiary.

While L.S. was building his business, he was also building a family. He and his first wife had six children: Samuel, Edward ("Joe"), Mark, Michael, Mary Anna, and Paul.[2] After his wife died, L.S. remarried, more than once, and had additional children. With his second wife, he had five children: James, Sophie, Theresa, Katrina, and Cecilia. Ultimately L.S. produced a total of 12 children and adopted another. It is apparent that L.S. and his children are all intelligent people. Many of them, including L.S., have multiple advanced degrees and are competent in various professional fields. L.S. and his children are also strong-willed individuals, which has led to unhappy conflicts lasting many years.

A major source of the conflict is between L.S. and his son Joe, who apparently have fundamentally different opinions about the proper way to manage AMERCO, a large service-oriented company. L.S. contends that he is committed to fundamental business principles, which some have called old-fashioned. His concept is that the U–Haul business should be centralized, that close control should be kept over the maintenance of the rental fleet, and that the attitude toward the employees should be paternalistic, even if

---

1. In no way should the recitation of this historical information be considered findings of fact. While interesting and informative, it was not relied upon by the court in its analysis of § 1129 and the issues in this case.

2. The names of the children are not necessarily listed by age as the court has no information regarding birth order.

such an approach cut into company profits. L.S. is also committed to broadly diversifying the company's service and product lines. By contrast, Joe Shoen seems to take what others might describe as a more modern view of management. He believes in decentralized control over the trailer and truck rental business, through franchising. Although he also favors diversification of the company's service and product lines, his vision is more narrow than that of L.S. In addition to their differences on business matters, it also appears that Joe and L.S. have a significant personality conflict. The conflict is aggravated by L.S.'s contention that Joe suffers from an "Oedipal complex" and by Joe's insistence that L.S. suffer "manic-depressive personality disorder." Regardless of whether such contentions are justified,[3] such epithets have not helped the parties to discover a way to settle their various problems.

All of these factors, working together, fanned the flames of controversy in 1986, although the embers of contention had been glowing for some time. At that time, L.S. was at the helm of AMERCO. His sons, Sam and Michael, were his confederates, as were daughters Mary Anna, Cecilia, Theresa, and Katrina.[4] Together the "L.S. faction" held approximately 49.66% of the common stock of AMERCO. Joe, Jim, Paul and certain other members of the family on Joe's side of the dispute also held a block of common stock, but slightly less than that of the L.S. faction. In 1986 L.S. left the management of AMERCO. The parties dispute the impetus for his departure. Thereafter, the rift between L.S. and Joe became heated. L.S. and/or his group began secretly orchestrating a hostile takeover. Joe and his cadre learned of the takeover plot and responded by issuing additional stock to five key employees. They also passed a corporate resolution, commonly known in securities circles as a "poison pill," which significantly impeded the ability of any stockholder to transfer a controlling block of stock. Together, these actions effectively blocked the takeover attempt. When the dust settled, the L.S. faction emerged owning approximately 47% of AMERCO's common stock, while Joe's group owned approximately 44% of the stock.

In a responsive maneuver, L.S. and his group (collectively, the "Share Case Plaintiffs") filed suit in the Arizona Superior Court (the "Share Case"), claiming that Joe and his confederates, which included Debtors Aubrey Johnson, John Dodds, and William Carty who at various times were members of the AMERCO board of directors, had breached their fiduciary duties, thereby reducing the value of the L.S. faction's AMERCO stock, by the issuance of the new stock and by 45 other acts.[5] Ultimately, the Share Case culminated in a jury trial, which was conducted in August of 1994. Before the matter was submitted to the jury, Superior Court Judge Thomas Dunevant III concluded that, if the Share Case Plaintiffs prevailed and were awarded damages, the judgment would violate the "double recovery" rule by enabling the Share Case Plaintiffs to receive both money damages *and* retain their stock. He also seemed motivated to put an end to the long-simmering family fight. Therefore, he gave the Share Case Plaintiffs a choice between either selling and surrendering their stock in the company for the amount determined by the jury, or dismissing the case and allowing them to continue as AMERCO stockholders. Apparently desiring to divorce themselves from the bitterness pervading AMERCO and U–Haul, the Share Case Plaintiffs elected the former option, and ultimately the jury returned a verdict in their favor, finding that Joe and his group had reduced the value of the Plaintiffs' AMERCO stock by $1.4 billion. They also awarded punitive damages against Joe in the amount of $70,000,000. After a remittitur proceeding, the judgment was reduced to $461,838,-000 and the punitive damage award to $7,000,000. A judgment then was entered

---

3. In reciting this history, the court renders no opinion on the accuracy of such contentions.

4. Technically, Katrina's stock was held in trust until November 1987.

5. Interwoven into this chronology are various other efforts to gain control of the corporation, a plethora of lawsuits in state and federal courts, and, sadly, allegations of murder and other intrigue between and among the two Shoen family factions. The court renders no opinion on the authenticity of any such allegations.

(the "Share Case Judgment" or the "Judgment"), which required the Share Case Plaintiffs to surrender their common stock in AMERCO upon receipt of payment of the judgment. Immediately thereafter, Joe and Jim Shoen, Aubrey Johnson, John Dodds and William Carty filed bankruptcy. Paul Shoen, another defendant in the judgment, elected not to file. This is where the present bankruptcy case controversy begins.

## II. *FINDINGS OF FACT*.

### A. *Procedural History in Bankruptcy Court.*

On February 21, 1995, these cases were filed pursuant to Chapter 11 of the Bankruptcy Code.[6] The following day, a motion seeking joint administration of all five cases was filed, which motion was granted on March 30, 1995. Promptly thereafter, on April 25, 1995, the Debtors represented by Streich Lang filed their plans and disclosure statements. On May 8, 1995, the remaining debtor filed his plan. Although each plan differed, in that each debtor had his individual debts to reorganize, the plans were similar in proposing a joint method of dealing with their collective, primary indebtedness: the $461 million joint and several liability under the Share Case Judgment.

In April, the Debtors filed an adversary proceeding wherein they asked the court to enjoin two AMERCO shareholders' meetings, which were then scheduled to be held before the end of 1995, at which four (4) members of the board of directors were to be elected. There are a total of eight (8) directors of AMERCO. The Debtors were concerned that if the meetings were held, the Share Case Plaintiffs, who control a significant block of the AMERCO voting stock, would wrest control of the board of directors and make it impossible for the Debtors to proceed further with their proposed plans of reorganization, and AMERCO's funding thereof, thereby nullifying the Debtors' efforts to repay the Judgment and rid AMERCO of the dissident Share Case Plaintiffs. The Debtors were hopeful that, with AMERCO's help, their plans of reorganization would resolve and satisfy the Judgment, making a change of control and further infighting unnecessary. On June 8, 1995, this court entered an order granting the injunction, until either the entry of an order confirming or denying confirmation of the Debtors' plans of reorganization, or until further order of the court.

On May 19, 1995, Paul Shoen, a non-debtor joint obligor under the Share Case Judgment, filed a motion for relief from stays. Paul had apparently negotiated an agreement with the Share Case Plaintiffs whereby he had agreed to attempt to sell the Share Case Plaintiffs' controlling block of stock on the open market, and use the proceeds to satisfy the Share Case Judgment. *See* Ex. B1–A. He also paid the Share Case Plaintiffs the sum of $1.5 million dollars. In exchange, the Share Case Plaintiffs released any right to execute against Paul on the Judgment, and also waived their right to certain judgment interest. In order for Paul to implement the agreement, Paul needed stay relief (1) to market the shares,[7] and (2)

---

**6.** Debtors Edward "Joe" Shoen, James Shoen, Aubrey Johnson, and John Dodds are represented by John J. Dawson, Susan G. Boswell, and Ronald Reinsel of Streich Lang. Debtor William Carty is represented by Lowell Rothschild, Scott Gan, Michael McGrath, and Eileen Hollowell of Mesch Clark & Rothschild. The Share Case Plaintiffs, as a group, were originally represented by Gil Shaw and Gary Ringler. Later, Mr. Ringler withdrew and Taylor C. Ashworth was retained. Also, L.S. Shoen elected to represent himself and his personal corporation, as did Michael Shoen. Both are lawyers (although L.S. is not licensed to practice in Arizona). Paul Shoen was represented by Michael Ahrens of Bronson, Bronson & McKinnon and Bret Maidman of Lewis & Roca. AMERCO was represented by Robert Hacket of Mohr, Hacket, Pederson &

Blakley and Richard Amoroso, in-house counsel to AMERCO. The court recognizes that many other attorneys, legal assistants, and secretaries at Streich Lang and the other firms represented in this case have also contributed significantly to the representation. However, specific recognition is given only to those attorneys who have appeared in court on behalf of a party.

**7.** It was Paul's position that stay relief was not needed to market the shares. However, the Debtors argued, and the court agreed, that the Debtors held an intangible property interest in the stock which was the subject of the Share Case Judgment and, as a result, the automatic stay would preclude a sale of such stock without court approval.

to file an action seeking to remove the poison pill,[8] which "pill" required the consent of the AMERCO board of directors to any transfer of a controlling block of common stock. On June 30, 1995, the court entered an order denying Paul's request for stay relief. The court also indicated that it viewed the determination of the legal nature of the Share Case Judgment to be pivotal to resolution of these bankruptcy cases.

In the context of Paul's request for stay relief, a question was also raised as to whether Paul had standing to appear in this proceeding. The Debtors contended that Paul was not a creditor of these estates because he had no liability under the Share Case Judgment, due to his separate settlement with the Share Case Plaintiffs. Although the court deferred a ruling on that issue, it is addressed below.

Also in May, 1995, a motion was filed to disqualify Streich Lang as counsel for four of the Debtors. The Debtors represented by Streich Lang responded in opposition. A hearing was conducted on June 28, 1995, at which time the parties agreed to defer the Court's consideration of the matter until August 11, 1995. On that date, a hearing was conducted and appearances entered by all of the interested parties. By order dated August 16, 1995, the motion was denied. That matter is currently on appeal.

On August 11, 1995, this court approved the Debtors' disclosure statements over the objections of creditors. The trial on confirmation was then held November 6–18, 1995. Closing arguments were presented on December 21, 1995.

Prior to the trial on confirmation, the Debtors reached a settlement with Mary

Anna Shoen and her corporation, Maran, Inc. Under the terms of the settlement, Mary Anna and Maran were to receive their pro rata share of the $350 million cash payout proposed in the plans and, in exchange, would surrender their stock to AMERCO to be retired to treasury. The Debtors, Maran, Inc., and Mary Anna also executed mutual releases of all claims against one another. *See* Ex. PS–15, 16. On September 25, 1995, the Debtors filed a motion seeking approval of the settlement and authorization to implement it. The various Share Case Plaintiffs objected. On October 10, 1995, the court overruled the objections, approved the settlement, and authorized its implementation, provided that Mary Anna's and Maran, Inc.'s stock was retired to the treasury of AMERCO. *See* Ex. PS–17. Thereafter, the settlement with Mary Anna was consummated.

## B. *The Proposed Plans of Reorganization.*

Each of the Debtors proposed individualized plans which deal with their individual debts.[9] However, all of the plans are identical with respect to the treatment of the Share Case Plaintiffs, the major creditors in all of the cases. The plans originally gave the Share Case Plaintiffs a choice of two alternative treatments, either of which was to be in full satisfaction of their claims.

*Option a.* Receive property [10] having a value equal to $461,838,000 plus judgment interest at the rate of ten percent (10%) per annum from February 14, 1995 [11] plus any taxable costs awarded against the Debtors under the Share Case Judgment; or

8. Presumably this is the same poison pill imposed by the AMERCO board of directors in 1987 which blocked the hostile takeover orchestrated by L.S. and Samuel Shoen.

9. Because the dispositive issue before this court is the whether the treatment of the Share Case Plaintiffs' claims is proper, this opinion need not address whether the treatment of each of the Debtors' individual creditors is appropriate.

10. The property was to consist of the following: (i) registered, Series "B" and "D" cumulative, non-voting preferred stock of AMERCO; (ii)

Class C Pass–Through Certificates of U–Haul Self Storage Trust 1993–1 Commercial Mortgage Asset Pass–Through Certificates (REMIC); (iii) beneficial interests in and to certain mortgage loans (including all rights to receive payments thereon after the effective date) secured by first priority liens on the properties subject to such mortgage loans; (iv) certain real property; and (v) cash.

11. The Debtors dispute that they are obligated to pay post-petition interest on the Judgment. Thus, their proposal to pay the same is subject to an ultimate determination on this issue.

*Option b.* Receive $350 million in cash.

Under either alternative, AMERCO was to be the funding source of the plans. *See* AMERCO Funding Resolution, Ex. PS–18. After confirmation, the Share Case Plaintiffs would be obligated to transfer their AMER-CO voting common stock to an entity designated by the Debtors. Notably, the Share Case Plaintiffs did not accept the $350 million cash discount and as a result, that election was withdrawn and the Debtors proceeded to confirmation of their plans solely on the basis of the transfer of properties to the dissenting class of Share Case Plaintiffs.

### C. *Treatment, Classification and Vote.*

The following is a summary of the plan of reorganization proposed by debtor, Edward J. Shoen, which is representative of all the proposed plans which respect to the treatment of the Share Case Plaintiffs. The plans proposed by the remaining Debtors also provide treatment for their other individual debts unrelated to the AMERCO dispute, but they are not described in detail herein.

| Class | Creditor | Treatment | Impaired? | Vote |
|-------|----------|-----------|-----------|------|
| 1 | Administrative Claims | Paid in full on the effective date. | No | N/A |
| 2 | Priority Unsecured Claims | Paid in full and in cash on the effective date. | No | N/A |
| 3 | Share Case Plaintiffs | Transfer of property, plus interest at 10% per annum from 2/14/95 until paid, plus taxable costs | Yes | Rejected |
| 4 | General Unsecured Claims | Paid in full, along with a market rate of interest, in three installments over one year. | Yes | Accepted |
| 5 | Punitive Damage Claim | Disputed. Transfer of money or property into an impoundment account (pending litigation over the allowance of the claim), sufficient to amortize the claim over a 10 year period, including 8% interest. | Yes | No votes [12] |
| 6 | Securities Litigation Claims | Disputed. Claims are subordinated for purposes of distribution under the plan. If and when allowed, claims will be paid over a 10 year period with 8% interest. | Yes | Accepted |

12. The creditors in this class are the same as the class 3 creditors, who voted against the plan. The results set forth in the chart are taken from the Debtors' Ballot Report, and the court renders no opinion at this time on the correctness of the report.

| Class | Creditor | Treatment | Impaired? | Vote |
|-------|----------|-----------|-----------|------|
| 7 | Share Case Judgment Codebtor Claims | If and when allowed, paid over 10 years at 8% | Yes | No votes |
| 8 | Debtor's Equity Interest | Retain all interest in reorganized debtor. | No | Deemed accepted |

---

#### D. *The Essence of the Plan*

The central issue in this case is whether the Share Case Plaintiffs (Class 3) must be paid in cash or may be paid in property. The Debtors propose to pay the claims primarily with property, and presented evidence with regard to its value. The evidence of value was disputed. In general, the Debtors desired to convey the following property in satisfaction of the class 3 creditors' claims and in order to satisfy the § 1129(b)(2)(B)(i) "cramdown" requirements. The property and its approximate values are:

| Witness | Type of Property | Value Opinion |
|---------|------------------|---------------|
| Robert D. Redmond (Lehman Brothers) | Series "B" preferred, non-voting stock in AMERCO | $101,000,000 |
| Robert D. Redmond (Lehman Brothers) | Series "D" preferred, non-voting stock in AMERCO | $193,000,000 |
| Robert D. Redmond (Lehman Brothers) | Real Estate Mortgage Investment Certificates (REMIC). A mortgage-backed securities trust pool (Class "C" Certificates) on real property located in 20 states. | $ 11,000,000 |
| Robert D. Redmond (Lehman Brothers) | Mortgage Notes on self-storage units located in seven states (restructured and existing loans) | $ 13,000,000 |
| Michael McKinney (Cushman and Wakefield) | Sixty-six (66) parcels of real property, with various estimated marketing periods | $ 46,477,000 |
| NA | Cash | $ 14,000,000 |
| **TOTAL** | | **$378,477,000** [13] |

---

#### E. *The Objections To The Plans.*

The Share Case Plaintiffs and Paul Shoen opposed the plans on a variety of grounds.

#### 1. *Paul Shoen's Objections.*

Paul Shoen raised the following objections, most of which centered on rights which he asserted as a result of the settlement which

13. Although the original judgment amount in favor of the Class 3 creditors was $461,838,000, this amount was reduced by approval of a settlement with Mary Anna Shoen and Maran, Inc. They were collectively paid $64,085,000, but the Judgment amount was reduced by $84,576,312. Thus, the amount necessary to pay the remaining Class 3 creditors was, at the time of confirmation, approximately $376,806,688 in principal. Nevertheless, for purposes of ease in understanding this decision, the court will refer to the original Judgment amount of $461,838,000 and the proposed discount of $350 million.

he had independently negotiated with the Share Case Plaintiffs:

a. The plans improperly attempted to acquire 100% of the Share Case Plaintiffs' stock without addressing Paul's alleged rights to all of the stock;

b. Because the Debtors did not tender cash to satisfy the Judgment, only Paul had the right to market the stock;

c. The plans ignored Paul's alleged entitlement, on satisfaction of the Judgment, to the Share Case Plaintiffs' stock by virtue of Paul's prior payment of $1.5 million cash;

d. Any dispute between Paul and the Debtors, over entitlement to the stock, could only be decided through an adversary proceeding, not at a plan confirmation hearing;

e. To the extent that the plans allowed AMERCO to designate an entity other than AMERCO to hold the stock, it violated Paul's rights as a shareholder of AMERCO; and

f. The plans improperly failed to address whether the Debtors would attempt to reject or assume two pre-petition executory contracts with Paul.

### 2. *The Share Case Plaintiffs' Objections.*

The Share Case Plaintiffs argued that, to "cramdown" the plans on them, as nonconsenting creditors, would be a misuse of the entire bankruptcy process. More specifically, they argued that:

a. The plans did not meet the good faith test of 11 U.S.C. § 1129(a)(3);

b. The plans improperly attempted to acquire the Share Case Plaintiffs' stock without paying cash, as was mandated by the Share Case Judgment;

c. The cramdown provisions of 11 U.S.C. § 1129(b) could not be used, because the Share Case Judgment mandated payment of cash as a prerequisite to obtaining the stock;

d. The debtors' plans improperly attempted to give nonvoting stock to the Share Case Plaintiffs in violation of 11 U.S.C. § 1123(a)(6);

e. The plans improperly attempted to avoid payment of post-petition interest, because the Debtors were solvent;

f. If the court believed that a cramdown was possible, then because the Share Case Plaintiffs' held secured claims, the plans did not afford the Share Case Plaintiffs the "indubitable equivalent" of their claims, as was required by § 1129(b)(2)(A);

g. The plans did not meet the liquidation test of § 1129(a)(7);

h. The plans did not meet the requirements of § 1129(a)(10) because no impaired, non-insider class had accepted the plans;

i. The plans were not fair and were not proposed in good faith;

j. The requirement that the Debtors accept a discount of their claims, to $350 million, and give up their AMERCO common stock in order to receive cash, was not fair and equitable;

k. The tax allocation adopted by the plans was not fair and equitable; and

l. The plans were not feasible.

### 3. *L.S. Shoen's Objections.*

L.S. Shoen also objected to the plans, contending, among other things, that they did not satisfy the liquidation test of § 1129(a)(7), that the plans were not feasible, and that the plans were not in the best interests of AMERCO.

### F. *Additional Findings.*

Because the issue of confirmation is resolved herein through an issue of law, this court need not make any findings regarding the valuation of the property. However, the following additional factual determinations are necessary to this decision:

1. These cases were precipitated by the entry of the Share Case Judgment which imposed a joint and several liability on the Debtors and non-debtor Paul Shoen, requiring them to pay the Share Case Plaintiffs $461,838,000, plus interest and taxable costs. The Share Case Judgment also provided that:

Upon payment or tender of the total dollar amount set forth above, together with accrued interest and taxable costs, all Plaintiffs' shares of AMERCO Common Stock identified above shall be transferred to Defendants or their designees.

(*See* Ex. PS–7; Share Case Judgment, page 3, at paragraph 2).

2. None of the Debtors have the ability to satisfy the Share Case Judgment from their personal assets and, therefore, must rely upon the obligation of AMERCO to indemnify them and to fund their plans of reorganization. *See* Ex. PS–9 through PS–13.

3. The Debtors have proposed plans of reorganizations which are intended to satisfy the Share Case Judgment through the means described above, and thereby acquire the AMERCO stock held by the Share Case Plaintiffs. *See* Bankruptcy Docket Nos. 29, 145, 25, 146, 27, 148, 153, 23, 147, 154, 33 & 167.

4. AMERCO has agreed to fund the proposed plans, with the property, identified in the plans. *See* Ex. PS–18; AMERCO Funding Resolution.

5. AMERCO, under rejected option (b), is capable of providing at least $350 million of cash to fund the Debtors' plan (inclusive of the amount paid to Mary Anna and Maran, Inc. in settlement of their claims).

## III. *LEGAL DISCUSSION.*

### A. *Paul Shoen's Standing.*

As a threshold matter, this court must determine whether Paul Shoen has standing to appear and be heard in these proceedings. Section § 1109(b) addresses standing in bankruptcy proceedings and provides:

A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b). This is a broad definition of standing. There is also case authority which provides that in order to have standing

to object in a bankruptcy proceeding, an objecting party must establish a direct and adverse pecuniary effect of the bankruptcy court action which the party is challenging. *See In re Fondiller,* 707 F.2d 441, 442 (9th Cir.1983); *In re Rohnert Park Auto Parts, Inc.,* 113 B.R. 610, 613 (9th Cir. BAP 1990). This basic rule of standing applies to parties who object to plan confirmation. *See In re Wonder Corp. of America,* 70 B.R. 1018, 1023–24 (Bankr.D.Conn.1987).

The Debtors argue that Paul is neither a creditor nor a party in interest in these cases. Paul settled the Share Case Plaintiffs' claims against him, in exchange for his payment of $1.5 million and his agreement to attempt to satisfy the Judgment by marketing the Share Case Plaintiffs' AMERCO common stock. Thus, the Debtors contend that Paul has no liability on the Judgment. However, the Debtors overlook Paul's joint and several liability with them on the Share Case Judgment. Even though the *Plaintiffs* may not enforce the judgment against Paul, there is nothing in the settlement agreement which prohibits Paul from potentially enforcing the Judgment against the Debtors. Setting aside for the moment the right of indemnification from AMERCO, if Paul satisfied the Judgment, he might then have rights of contribution, reimbursement, or subrogation against the Debtors. This possibility is expressly recognized by the Debtors in Class 7 of Joe's proposed plan. Thus, Paul is or could be a contingent creditor of these Debtors.

Granted, any claim which Paul may ultimately have against the Debtors is remote under the circumstances. However, that does not take such contingent rights outside of the definition of a claim for bankruptcy purposes.

To hold that a claim for contribution arises only when there is an enforceable right to payment appears to ignore the breadth of the statutory definition of "claim." In relevant part, a claim is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C.A. § 101(5)(A).

This "broadest possible definition" of "claim" is designed to ensure that "all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case."

*In re Jensen*, 995 F.2d 925, 929 (9th Cir.1993) *quoting* H.R.Rep. No. 595, 95th Cong., 2d Sess. 1, 309 (1978), U.S.Code Cong. & Admin.News 1978 at pp. 5787, 6266.

There is also the matter of Paul's interest in the Share Case Plaintiffs' AMERCO common stock. The Debtors have successfully argued that Paul may not market such stock because of the Debtors' interest therein. Specifically, the Debtors argued:

> ... the interest in the AMERCO stock granted to the Debtors by the [Share Case Judgment], including the right to acquire the AMERCO Stock, is property of the Debtors' estates and is the cornerstone of the Debtors' Plans.

Debtors' Response And Objection To Paul Shoen's Motion To Modify The Automatic Stay, dated June 6, 1995, page 9, lines 1–4. This argument cuts both ways. Paul and the Debtors stand in exactly the same position with respect to their interest in and ability to acquire the AMERCO stock. The Debtors cannot take cover under the protection of the automatic stay by claiming they have an interest in the stock and at the same time propose to take away Paul's interest in the stock without giving him an opportunity to be heard. Under the Debtors' own arguments, Paul has a direct and pecuniary interest adversely affected by the plans.[14] Thus, this court cannot conclude that Paul is without standing to appear and be heard in these confirmation proceedings.

### B. *Are These Cases Filed in Good Faith?*

The court must address the repeated allegations that these cases were filed in bad faith. It is well-settled that "good faith" is the threshold prerequisite to obtaining relief under Chapter 11 of the Bankruptcy Code. The Ninth Circuit Bankruptcy Appellate Panel has explained the "good faith" requirement:

> Where a petition is filed to subvert the legitimate rights of creditors in the absence of any reasonable expectations that the debtor can reorganize, there is no basis for access to Chapter 11 and the protective machinery of the automatic stay.

*See In re Thirtieth Place*, 30 B.R. 503, 506 (9th Cir. BAP 1983). Given the protracted history of this dispute, the Share Case Plaintiffs have argued that any attempt to avoid full payment of the Share Case Judgment, pursuant to the terms of such judgment, which they maintain requires cash, is nothing more than another attempt by the Debtors to circumvent justice. However, this court cannot agree. The remedies afforded by the Bankruptcy Code were created by Congress to provide individuals and businesses the chance to emerge from financial difficulties, by allowing them to reorganize their debts within the parameters imposed by the law. At the time these cases were commenced, these Debtors were faced with a staggering $461 million debt, which they could not possibly pay from their personal resources. They had no choice but to look to AMERCO, which is obligated to indemnify the Debtors and Paul Shoen, in order to satisfy the debt. However, they claim that AMERCO is unable to completely satisfy the obligation with cash and, as a result, the bankruptcy was necessary. Of course, the Share Case Plaintiffs disagree. But, such dispute is ultimately immaterial. There is sufficient evidence to establish that satisfying such claim in cash would definitely strain AMERCO, and impact its ability to access the commercial marketplace. Through the creative efforts of their lawyers, the Debtors have proposed plans which, if confirmed, would significantly reduce this strain and gain the beneficial ends intended by Congress. Although this court has concluded that, as a matter of law, the plans cannot be confirmed as proposed, it cannot conclude that it was wrong for the Debtors to try. The Debtors' plans are creative. There is no evidence that the bank-

---

14. Admittedly, Paul may have relinquished his interest in the stock when he demanded and received reimbursement from AMERCO of the $1.5 million he paid to the Share Case Plaintiffs.

This event, however, occurred well after the confirmation trial had begun and, as a result, will not be considered for purposes of this decision.

ruptcies were filed with malice or ill-will. The Debtors have presented reasonable legal arguments on issues about which there is no clear statutory or case authority. Thus, this court cannot find that these cases were filed in bad faith. Therefore, the court may now proceed to determine whether the debtors' plans are confirmable on other grounds.

## C. *Plan Confirmation.*

■ In order for the Debtors' plans to be confirmed, they must establish, by a preponderance of the evidence, that all of the requirements of 11 U.S.C. § 1129(a) and (b) have been met. *See In re Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1163–65 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). In light of the Supreme Court's decision in *Grogan v. Garner,* 498 U.S. 279, 280, 111 S.Ct. 654, 655–56, 112 L.Ed.2d 755 (1991) (nondischargeability case), the courts in the Ninth Circuit and other circuits recognize that a debtor need establish compliance with the requirements for a "cramdown" plan only by a "preponderance of the evidence." *See In re Arnold & Baker Farms,* 177 B.R. 648, 654–55 (9th Cir. BAP 1994); *In re Patrician St. Joseph Partners Limited Partnership,* 169 B.R. 669, 680 (D.Ariz.1994); *In re Monarch Beach Venture, Ltd.,* 166 B.R. 428, 432 (C.D.Cal.1993); *In re Cellular Information Systems, Inc.,* 171 B.R. 926, 937 (Bankr.S.D.N.Y.1994). However, in this case, confirmation turns on an issue of law. Hence, this court need not weigh the evidence.

### 1. *What is The Nature Of The Share Case Judgment?*

The pivotal issue is the nature, or the legal interpretation, of the Share Case Judgment. The parties have each presented their views in post-trial briefs. The Debtors allege that the judgment is *not* an executory contract, is *not* a secured claim, but is only an unsecured claim subject to treatment consistent with the requirements of Chapter 11. Michael and L.S. assert that the judgment is a judicially-ordered sale of the Share Case Plaintiffs' AMERCO stock, the terms of which are not subject to modification pursuant to a plan of reorganization. The balance of the Share Case Plaintiffs take essentially the same view

as L.S. and Michael. In some respects, in this court's judgment, each of the parties are correct, and in other respects each are incorrect. The inescapable reality is that the Share Case Judgment does not fit neatly into any single definition or concept contained in the Bankruptcy Code or the related case law.

### a. *The Share Case Judgment Is Not An Executory Contract.*

■ The Judgment has elements which make it akin to an executory contract. An executory contract is generally defined as an agreement on which performance remains due to some extent on both sides. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1978) *reprinted in Bankruptcy Litigation and Practice: A Practitioner's Guide,* § 4.6.1. This view is known as the "Countryman Definition." *See* Countryman, *Executory Contracts in Bankruptcy,* 57 Minn.L.Rev. 439, 450–460 (1973); *see also In re Cochise College Park, Inc.,* 703 F.2d 1339, 1348–50 (9th Cir.1983). Certainly performance is due on both sides of the Share Case Judgment. The Debtors and Paul Shoen are obligated to pay the Judgment. Once payment is made, the Share Case Plaintiffs are, in exchange, obligated to transfer their AMERCO stock to the Debtors and Paul, or their designees.

Certain parties have analogized the Share Case Judgment to a judgment for specific performance, and have cited the court to *In re Roxse Homes, Inc.* 74 B.R. 810 (Bankr. D.Mass.1987), *aff'd,* 83 B.R. 185 (D.Mass. 1988) and *In re Glaze,* 169 B.R. 956 (Bankr. D.Ariz.1994), which stand for the proposition that such a judgment is not an executory contract. In each of those cases the debtor had refused to transfer title to property in exchange for payment and, as a result, became the defendant in a suit for specific performance. When a judgment was entered, the debtor filed bankruptcy and sought to reject the contract and thereby avoid the obligation to transfer the property. Both courts found that the judgment for specific performance was not an executory "contract" which was, in any way, subject to assumption or rejection in bankruptcy.

The present case is distinguishable in two significant ways. First, the roles of the parties are reversed. Here it is the Share Case

Plaintiffs, not the Debtors, who have the obligation to transfer the property. The Debtors are not trying to avoid an obligation to transfer property; instead, they are trying to avoid the obligation to transfer the "payment price" in cash, while, at the same time, retaining the right to *receive* property. This distinction is critical.

Second, the present case is also distinguishable in that the performance owed by the Debtors is not ministerial. Both the *Glaze* and *Roxse* courts emphasized that the debtor's obligation to transfer the property was ministerial in nature and, in fact, was self-executing. That is not the case here. The Debtors' obligation involves the payment of a very large sum of money which cannot, even among the most sophisticated group of businesspersons or lawyers, be considered ministerial and is certainly not self-executing. Thus, the cited authority is factually distinguishable.

Nevertheless, this court must agree with the *Glaze* and *Roxse* courts' ultimate conclusion that the judgment is not in the nature of an executory contract. Although it has certain characteristics of something "executory," it is not a contract. It is, as Michael Shoen has suggested, a judicially-set sale price for stock upon payment of a specific sum. A court of competent jurisdiction has imposed this obligation, by judgment, upon the Debtors and Paul Shoen. The Debtors are no more at liberty to reject this obligation than were the Debtors in *Glaze* and *Roxse*. There is nothing in the Bankruptcy Code which allows the Debtors to escape the requirements of a judgment for specific performance, or to alter its clear terms. Thus, the Share Case Judgment is not an executory contract subject to assumption or rejection pursuant to § 365.

b. *The Share Case Judgment Must Be Bifurcated For Purposes Of This Analysis.*

Nevertheless, the executory contract analysis is instructive because it emphasizes that

there are two separate, but equally important, sides to the Share Case Judgment. They are: (1) the obligation of the Debtors and Paul Shoen to pay damages to the Share Case Plaintiffs; and (2) once those damages are paid, the obligation of the Share Case Plaintiffs to transfer their AMERCO common stock to the Debtors and Paul and/or their designees. If these two obligations are analyzed separately, it is a relatively straightforward matter to give them *each* a label and to consider what treatment is entitled under the Bankruptcy Code. Indeed, as is discussed below, the obligation of the Debtors and Paul to pay the Judgment fits neatly into the definition of an unsecured claim. The corresponding obligation to transfer the stock is easily understood if treated as a judicially-ordered right to acquire property for a pre-arranged price. However, if both parts are taken together as a whole, it is impossible to find a comfortable fit. If this Court tries to do so, it is left with the impossible task of trying to fit a square peg into a round hole.[15] Indeed, the Debtors have not referred this court to a single case involving similar facts, and this court has been unable to locate any through independent research. Thus, this court must consider the two obligations, contained in the single Judgment, separately, and rule accordingly.

c. *The First Prong: The Obligation To Pay The Share Case Plaintiffs Is An Unsecured Claim.*

■ It has been argued that the Share Case Judgment is in the nature of a claim and, with respect to the Debtors' and Paul's obligation to pay the Share Case Plaintiffs, this court agrees. Under Bankruptcy Code § 101(5)(A), the definition of a "claim" includes the following:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, dis-

---

**15.** The Debtors have attempted to employ a legal engineering feat on par with the creative efforts of the NASA engineers who created a new carbon monoxide filter for the crippled Apollo 13 spacecraft. With duct tape, cardboard, and plastic, the engineers made a square peg fit into a round hole. J. Lovell & J. Kluger, *Lost Moon:*

*The Perilous Journey of Apollo 13* (Houghton Mifflin 1994). Unfortunately for the creative lawyers in theses cases, the Share Case Judgment cannot, with either duct tape or legal phraseology, be made to fit into a single legal category.

puted, undisputed, legal equitable, secured, or unsecured. . . .

11 U.S.C. § 101(5)(A).

■ The definition of a "claim" under the Bankruptcy Code is extremely broad and is designed to encompass virtually any debt or other obligation of a debtor. *See, e.g., In re Jensen,* 995 F.2d 925, 929 (9th Cir.1993) (Bankruptcy Code § 101(5)(A) is designed to provide the "broadest possible definition" of a "claim" in order to ensure that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case," quoting legislative history to Section 101(5)(A)); *In re Kilpatrick,* 160 B.R. 560, 564 (Bankr.E.D.Mich. 1993) (any right which can be reduced to monetary damages constitutes a "claim" under Bankruptcy Code § 101(5)).

The courts also recognize that a money judgment against a debtor creates a "claim" under the judgment that falls within the scope of Bankruptcy Code § 101(5). *See Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 786 F.2d 794, 799 (7th Cir.1986); *In re Hanson,* 107 B.R. 525, 527 (Bankr.W.D.Va.1989); *In re Bland,* 149 B.R. 977, 982 (Bankr.D.Kan.1992) (a judgment debt creates a right to payment that falls within the definition of "claim" in Bankruptcy Code § 101(5)).

This court notes that the Share Case Judgment awarded monetary damages, which are jointly and severally the obligations of the Debtors and Paul Shoen. The Share Case Judgment gave the Share Case Plaintiffs a "right to payment" for their damages, which is clearly a "claim" under Bankruptcy Code § 101(5)(A).

■ More specifically, the Share Case Judgment created an unsecured claim. *See Olympia Equipment,* 786 F.2d at 799 (judgment creditors are entitled to assert only general unsecured claims unless they have taken steps to perfect a judgment lien in property of the debtor); *Hanson,* 107 B.R. at 527 (when a judgment creditor has taken no steps to perfect a judgment lien, the judgment creditor holds an unsecured claim.) There is no allegation nor evidence that the Share Case Plaintiffs have perfected a judg-

ment lien against property of the Debtors. Moreover, they do not hold liens on the AMERCO common stock which they are obligated to transfer to the Debtors and Paul upon satisfaction of the judgment, simply because they currently own the stock. Ordinarily, a person cannot hold a lien on property which that person owns, because any such security interest merges into the right of ownership. *See* 55 *Am.Jur.2d* "Mortgages," § 1256; *Bowman v. Cook,* 101 Ariz. 366, 419 P.2d 723 (1966). Thus, the damages portion of the Share Case Judgment is an unsecured claim. If the treatment of this unsecured claim proposed under the plans of reorganization passes muster under §§ 1129(a) and (b)(2)(B), and if the plans are otherwise confirmable, the Debtors' obligation to the Share Case Plaintiffs would be discharged upon completion of the plans, and the Debtors would have no further obligation to the Plaintiffs on the monetary portion of the Judgment.

d. **The Second Prong: The Obligation Of The Share Case Plaintiffs To Transfer Their Stock To The Debtors Is Governed By State Law.**

However, using the bankruptcy process to discharge the monetary obligation imposed by the Judgment does not entitle the Debtors to require that the Share Case Plaintiffs transfer their AMERCO common stock to the Debtors. The Share Case Judgment provides, in pertinent part:

Upon payment or tender of the total dollar amount set forth above, together with accrued interest and taxable costs, all Plaintiffs' shares of AMERCO common stock identified above shall be transferred to Defendants or their designees."

(*See* Ex. PS–7; Share Case Judgment, page 3, at paragraph 2.) This paragraph sets the terms by which the Debtors may acquire another's property, the Share Case Plaintiffs' AMERCO common stock. There is nothing in the Bankruptcy Code to equate discharging an obligation under a judgment with either satisfying it or authorizing acquisition of another's property with something less than full payment.

Section 524 sets forth the effect of a discharge:

(A) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section ... 1141 ...

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor....

11 U.S.C. § 524(A). Nothing in this section supports the notion that a discharge would constitute compliance with the terms of the Share Case Judgment's second prong.

Case law teaches that discharging a debt and paying a debt are not the same. *In re Berry*, 85 B.R. 367 (Bkrtcy.W.D.Pa.1988) demonstrates the distinction:

The issue in this case focuses on the effect of a discharge in bankruptcy. Under former § 14(f) of the Bankruptcy Act, the Bankrupts in this case were granted discharges. The cases are clear in construing § 14(f) to mean that the effect of a discharge was simply to release a Bankrupt's personal liability for repayment of the debt. The discharge is not a payment or extinguishment of the debt itself. It simply bars future legal proceedings to enforce the discharged debt against the Bankrupts.

*Id.* at 369. The distinction was also recognized in *Wagner v. United States*, 573 F.2d 447, 453 (7th Cir.1978): "[W]e note that a discharge does not cancel the obligation; the obligation still exists. A discharge merely disables the creditor from enforcing its claim." Thus, in a circumstance such as this, the Debtors may be able to confirm a plan which will discharge the obligation to the Share Case Plaintiffs without full payment in cash of the judgment amount, by the transfer of property found to be equivalent in value to the claim amount. However, the discharge does not, in and of itself, alter the instant Judgment's *other* mandate, the terms by which the Debtors may acquire the Share Case Plaintiffs' stock, to wit, "payment or tender of the total dollar amount" of the

Judgment. This phrase means cash or good funds.

The right to acquire the property of another—here, the Plaintiffs' AMERCO stock—is strictly a creature of state law, and this court knows of no vehicle in either state law or the Bankruptcy Code which would allow the Debtors to alter the terms by which they could acquire the Share Case Plaintiffs' stock. Generally, under state law, "[t]he party who claims the benefit of a judgment rendered in his favor must comply with any terms or conditions which it imposes on him, and failure to do so will destroy the effect of the adjudication." 49 C.J.S., *Judgments* § 447 (1995 Supp.). Case law establishes that only cash payment may truly "satisfy" a money judgment:

Generally, the only way a money judgment can be satisfied is by payment in money, unless the parties agree otherwise.... Ordinarily, a money judgment must be paid in cash, and the judgment holder can require that it be made in this way.

47 Am.Jur.2d *Judgments* § 1016, at 448–49 (1995); *see also Noyes v. Habitation Resources, Inc.*, 49 Cal.App.3rd 910, 123 Cal. Rptr. 261 (judgment creditor entitled to demand tender of payment in cash, not check); Annot., 82 A.L.R.3rd 1192 (1975); *Koepke v. Carter Hawley Hale Stores, Inc.*, 140 Ariz. 420, 682 P.2d 425 (Ct.App.1984) ("Satisfaction is a technical term and nothing but this is a legal satisfaction of the judgment." *Id.* at n. 1); *Arizona Cotton Ginning Co. v. Nichols*, 9 Ariz.App. 493, 454 P.2d 163, 165 (1969) ("When an individual binds himself absolutely to pay money, he cannot later claim the agreement was to pay in something other than money.")

In *Giraud v. Reserve Realty Co.*, 94 S.W.2d 198 (Tex.Civ.App.1936), the Girauds obtained a judgment against Reserve Realty pursuant to which the Girauds were given an exclusive option to purchase a lot for the sum of $2,500. As here, the judgment required payment of cash money, and required Reserve to clear title within ten days of payment. The Girauds tendered a personal check with an endorsement that the money was not to be paid until title was cleared.

The court found that the Girauds did not meet, and indeed altered, the requirements of the judgment that the $2,500 be paid first, and ruled that the Girauds had, by failing to comply strictly with the terms of the judgment, relinquished the rights to the lot which had been granted under the terms of the judgment. Similarly, in this case, state law provides no means by which the Debtors may transfer property in lieu of the cash required by the Share Case Judgment, without the express consent of the Share Case Plaintiffs.

■ Likewise, bankruptcy provides no means for such a substitution. Section 541 looks to state law to determine the nature and extent of a debtor's interest in property and transfers such interest intact to the bankruptcy estate. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Such interests are not enlarged, enhanced, or altered. For instance, in *In re Morris,* 154 B.R. 556 (Bkrtcy.D.Ariz.1993), the debtor, who was the named beneficiary under a life insurance policy on his deceased wife, sought to claim the proceeds as an asset of the estate. The insurance company refused to pay the proceeds to the estate, claiming that the debtor was estopped, pursuant to state law, to receive the proceeds because he had murdered his wife. In ruling against the debtor, Judge Nielsen examined the state-created rights held by the debtor, and transmuted them into the bankruptcy process. "Although the estate holds an interest in the proceeds, the Court must examine the extent of this right under Arizona law. Congress generally leaves the determination of property rights to applicable non-bankruptcy law (citation omitted)." *In re Morris* at 558. Under state law, the Debtors have a right to pay cash and acquire the AMERCO stock. Upon filing bankruptcy, this right was transferred to their estates, without modification. Thus, the condition for acquisition of the Share Case Plaintiffs' stock is the payment of money, not substituted value, equal to the amount of the judgment.[16]

Section 1129(b) provides no means for altering the transfer provisions and terms of the Share Case Judgment. Admittedly, altering state law rights is at the heart of § 1129(b), which is why it is colloquially called a "cramdown." Section 1129(b) allows a debtor to modify its obligations under both secured and unsecured debts, and to force such modifications upon affected creditors, without regard for the requirements of state law or the creditor's dissent. However, such provisions apply to holders of secured claims, unsecured claims, and interests. The obligation of the non-debtor Share Case Plaintiffs to give up their property for anything less than full compliance with the terms of the Judgment does not fall into any of these categories. Thus, the cramdown provisions of § 1129(b) do not apply to this aspect of the Share Case judgment.

Moreover, the Debtors' contention that they need not pay post-petition interest on the claim is untenable. Assuming, *arguendo,* that the Debtors are insolvent, as they contend, then they could avoid the debt obligation to pay post-petition interest. *See In re San Joaquin Estates,* 64 B.R. 534, 536 (Bankr. 9th Cir.1986); *In re Schoeneberg,* 156 B.R. 963, 969 (Bankr.W.D.Tex.1993). However, bankruptcy law does not control the terms by which the Plaintiffs' AMERCO stock may be acquired. On that aspect of the Judgment, the price for the AMERCO stock continues to increase daily. In sum, the plans of reorganization, as presently proposed, cannot be confirmed because they include provisions which require the Share Case Plaintiffs to surrender their valuable AMERCO common stock without a corresponding requirement on the part of the Debtors to satisfy, in cash, the explicit terms of the Share Case Judgment.

### 2. *Are the Plans of Reorganization Proposed In Good Faith?*

■ It has also been argued that the plans were not proposed in good faith, as is required by 11 U.S.C. § 1129(a)(3)[17], and

---

**16.** This conclusion is supported by 11 U.S.C. § 365, which deals with executory contracts, which, as is discussed above, are similar in nature to the present Share Case Judgment. Pursuant to § 365(b)(1), a debtor must cure an executory contract according to its terms, before it can be assumed.

**17.** In chapter 11, a good faith analysis is undertaken twice. First, the court must determine

this court is inclined to agree, but for reasons different than those asserted by the objectors. A plan is proposed in good faith when the "plan will fairly achieve a result consistent with the Bankruptcy Code." *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir.1984). The primary purpose of Chapter 11 is to achieve a reorganization of the debtor and to maximize the value of the estate. *See In re Bonner Mall Partnership,* 2 F.3d 899, 916 (9th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648, *cert dismissed,* —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); *see also In re Nite Lite Inns,* 17 B.R. 367, 370 (Bankr. S.D.Cal.1982); *In re Consolidated Operating Partners, L.P.,* 91 B.R. 113, 115 (Bankr. D.Colo.1988). A plan achieves a result consistent with the purposes of the Bankruptcy Code when the "plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success." *In re Sun Country Development, Inc.,* 764 F.2d 406, 408 (5th Cir.1985); *Consolidated Operating Partners,* 91 B.R. at 115. This court questions whether there was a reasonable hope of success for the currently proposed plans.

The Share Case Plaintiffs desire to receive cash for their AMERCO stock, and they do not desire to maintain a continuing relationship with AMERCO. Although the Debtors were clearly aware of this desire at the time these cases were filed, the Debtors proposed plans which gave the Share Case Plaintiffs their wish, but at a monumental price: a 25% discount on the principal of the Judgment *plus* a complete forfeiture of any post-judgment interest. The Debtors also proposed that, if the Share Case Plaintiffs insisted on

being paid the full $461 million due them, then in return they would give them property of disputed value [18] *and* force them to endure a continuing relationship AMERCO as "second-class citizens" holding non-voting preferred stock with speculative future value, and with no corresponding control over the corporate affairs of AMERCO. The Debtors thus gave the Share Case Plaintiffs an uncompromising choice and, in April, 1995, when these plans were filed, one would not have needed to consult a crystal ball to predict that the majority of the Share Case Plaintiffs would vigorously resist the proposition. Thus, the plans were based completely on the legal wager that the court would find in the Debtors' favor on the issue of whether they could force the Share Case Plaintiffs to transfer their stock without paying the Judgment in full and in cash and then, if they won on the legal issue, the factual wager that the court would find that the value of the proposed property, the majority of which was made up of newly-issued preferred stock, was adequate.

This approach is perplexing, because contained within these unconfirmable plans are all the necessary elements of a compromise. It is undisputed that AMERCO has *at least* $350 million of cash which it can use to satisfy the judgment. The Debtors could have attempted a settlement which proposed to pay the Share Case Plaintiffs that $350 million of cash *and* to then satisfy the balance of the obligation by *either* (i) transferring property with an indisputable value equal to the remaining balance, or (ii) generating cash by selling a non-controlling block of the Plaintiffs' stock.[19] Given these readily

---

whether the filing of the case itself was in good faith. Here, the court has concluded that it was. Second, the court must determine whether the plan is proposed in good faith, pursuant to § 1129(a)(3). These are separate considerations.

18. In addition to the dispute over the value of the property, it is also noteworthy that much of the property to be transferred carries with it substantial management burdens and lengthy marketing periods should the new owners elect to sell, or is based upon uncertain and speculative resale prices.

19. Of course, given the history of this dispute, it is certainly possible that a consensual plan may

never be achieved under any circumstance. If that be the case, then these parties will probably be locked in perpetuity in the purgatory of continual conflict. However, a compromise such as mentioned above could be an acceptable solution for all concerned and is the *only* way to avoid the months, if not years of further litigation and appeals which will undoubtedly follow this and other decisions in this, and other cases. Thus, the court strongly encourages the parties to once again consider settlement discussions, in order to avoid further wasteful, unpredictable and expensive litigation. A court settlement judge is available for such purposes.

available options which would have a greater chance of being accepted by the Share Case Plaintiffs than the presently proposed plans, it is clear that the plans include a purpose beyond mere reorganization. Most likely that purpose was to gain control of the Share Case Plaintiffs' AMERCO stock. Because proposing a plan which had a reasonable hope of being accepted was obviously less important to the Debtors than the objective they were hoping to achieve through the current plans, there is, at least, a suggestion of bad faith. Nevertheless, because the Debtors' plans have been found to be unconfirmable on specific legal grounds, the court need not make a finding as to good faith nor does it need to resolve the balance of the objections to the plans.

## IV. *RULING.*

Consistent with the foregoing, IT IS ORDERED denying confirmation of the Debtors' plans of reorganization. A separate order will be entered containing this ruling. *F.R.Civ.P.* 58; *Fed.R.Bankr.P.* 9021.