In re Edward J. SHOEN; In re James P. Shoen; In re Aubrey Johnson; In re John Dodds; In re William Carty, Debtors.

Edward J. Shoen; James Shoen; Aubrey Johnson; John M. Dodds; William Carty; AMERCO, Appellants,

v.

Samuel W. Shoen; Cecilia M. Hanlon, a/k/a Cecilia M. Shoen–Hanlon; Katrina Carlson, a/k/a Katrina Shoen–Carlson; Samwill, Inc.; Kattydid, Inc.; Mickl, Inc., Appellees.

In re Edward J. Shoen; James P. Shoen; Aubrey Johnson; John Dodds; William Carty, Debtors.

Samuel W. Shoen; Cecilia M. Hanson, a/k/a Cecilia M. Shoen–Hanson; Katrina Carlson, a/k/a Katrina Shoen–Carlson; Samwill, Inc., now called Katabasis International, Inc.; Cemar, Inc.; Kattydid, Inc.; Mickl, Inc., Appellants,

v.

Edward J. Shoen; James Shoen; Aubrey Johnson; John M. Dodds; William Carty; AMERCO, Appellees.

Nos. 97–17369, 98–15455.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1999.

Decided May 6, 1999.

Shirley M. Hufstedler, Morrison & Foerster, Los Angeles, California, for the appellants.

C. Taylor Ashworth, Andrew D. Hurwitz, Osborn Maledon, Phoenix, Arizona, for the appellees.

Before: FERNANDEZ and McKEOWN, Circuit Judges, and WEINER,[1] District Judge.

PER CURIAM Opinion; Dissent by Judge McKEOWN.

PER CURIAM:

Edward J. Shoen, James P. Shoen, Aubrey K. Johnson, John M. Dodds, William E. Carty, and AMERCO (collectively the Edward Shoen Interests) appeal the bankruptcy court's order which awarded post-petition interest to Samuel W. Shoen, Katabasis International, Inc., Michael Shoen, Mickl, Inc., Katrina Shoen–Carlson, Kattydid, Inc., Cemar, Inc., and Cecilia M. Shoen–Hanlon (collectively the Samuel Shoen Interests). The Samuel Shoen Interests appeal the bankruptcy court's order which determined that the post-petition interest at the Arizona judgment rate stopped running once the Edward Shoen Interests deposited the then accrued interest in an interest bearing Escrow Account under the auspices of the bankruptcy court. We affirm.

■ 1. The post-petition interest problem arose because of a rather unusual judgment issued by the Arizona Superior Court in which the Samuel Shoen Interests were required to transfer all of their shares of AMERCO common stock to the Edward Shoen Interests once the latter paid $461,838,000 together with accrued interest at 10 percent per annum plus costs to the former. The Edward Shoen Interests promptly filed bankruptcy and sought to use the protections afforded by those proceedings in order to pay something other than the amount decreed by the Arizona Superior Court, and also obtain transfer of the stock. In other words, they would have liked it if they could keep much of their money and still get the stock. We agree with the bankruptcy court and the Bankruptcy Appellate Panel that the Edward Shoen Interests are not entitled to that Panglossian a result. We do so for the reasons articulated by the BAP which we adopt. *See Shoen v. Shoen (In re Edward J. Shoen)*, BAP No. AZ–96–1884–KJRy pages 11–16 (B.A.P. 9th Cir. Oct. 22, 1997) (unpublished disposition).[2] We add only a few reflections. It is necessary to analytically place the Arizona judgment into one category or another, although it does not comfortably fit in any standard ones. In our opinion, the BAP chose the best fit when it dubbed the judgment "a judicially prescribed sale of stock." *Id.* at 14. The Arizona Superior Court told the Samuel Shoen Interests that if they wanted their damages they had to turn over their stock to the Edward Shoen Interests, and gave the Edward Shoen Interests the consolation of knowing that once they paid all that was owed they could have the stock. Call it what you like, but the Edward Shoen Interests had no right whatever to obtain the property of the Samuel Shoen Interests until they complied with the terms of the Arizona judgment. That the bankruptcy court required them to do just that violates neither the policies, the purposes, nor the letter of the bankruptcy law. In short, the Edward Shoen Interests could not obtain transfer of the stock of the Samuel Shoen Interests

---

1. Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2. We attach this decision as Appendix A to this opinion.

without paying the full price, which included all of the interest.

■ 2. Not to be outdone in the have-your-cake-and-eat-it sphere, the Samuel Shoen Interests seek to mulct the Edward Shoen Interests for even more interest than the $55,000,000 deposited in the Escrow Account plus interest which has been accruing on that deposited amount. They find a wedge for their argument in the somewhat uncertain state of the paper record when the rest of the case was resolved by the bankruptcy court. That court was well aware of what had gone on throughout the proceedings and at the time when the rest of the issues were settled. It was also aware of what the parties and the court really intended at that time. We cannot say that it erred in construing what it was doing at the time of plan approval, and, again, we are satisfied that the BAP has articulated the reasoning and result quite satisfactorily. *See id.* at 16–22.

■ Even if that were not so, we are equally satisfied that the interest stopped as a matter of law when the $55,000,000 was deposited into the Escrow Account. This was no mere escrow account controlled by a debtor while liability was being litigated on appeal. *Cf. International Telemeter Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1495–96 (9th Cir.1985). It was, rather, more in the nature of an unconditional tender of the money. *Cf. Homes & Son Constr. Co., Inc. v. Bolo Corp.*, 22 Ariz.App. 303, 306, 526 P.2d 1258, 1261 (1974); *Bartlett v. Heersche*, 209 Kan. 369, 374, 496 P.2d 1314, 1317–18 (1972). Of course, the tender was not entirely unconditional, but it was very close to that. The only condition was that the bankruptcy court determine that the post-petition interest amount was owed. And if the Samuel Shoen Interests could not access the money immediately, neither could the Edward Shoen Interests enjoy its fruits in the meantime. Notably, the use of the Escrow Account in this case was part of a deal that also freed up the principal amount—$461,838,000—for the Samuel Shoen Interests' use right away. That

was a not inconsiderable benefit, and went far beyond what one would obtain from a mere supersedeas bond.

AFFIRMED.

McKEOWN, Circuit Judge, dissenting:

Because I find no magic in the nature of the Arizona judgment that removes it from the general rule disallowing postpetition interest on unsecured claims, I respectfully dissent.

## I.

### Nature of the Judgment

The majority takes a straightforward state court judgment for damages and transforms it into "a judicially prescribed sale of stock" that is impervious to the operation of federal bankruptcy law. As the majority acknowledges, this is an effort "to analytically place" the judgment into a category, even one that does not "comfortably fit." The judgment calls for no such creativity on our part.

This is not a case, as the majority suggests, where one party has sought in bad faith to use bankruptcy proceedings in order to escape its rightful creditors and obtain a "free lunch." The bankruptcy court expressly ruled to the contrary, finding "no evidence that the bankruptcies were filed with malice or ill-will" but rather that the debtors sought to "gain the beneficial ends intended by Congress." *In re Shoen*, 193 B.R. 302, 312–13 (Bankr. D.Ariz.1996). The Bankruptcy Appellate Panel ("BAP") aptly described this appeal as "a $55 million mopping-up operation in a $1.5 billion family feud that has been waged for longer than World Wars I and II combined." Given the long and tortured history of this litigation, it seems particularly inappropriate at this stage for us to make judgments about the legal maneuverings of one side or the other. Instead, our role is to analyze the judgment vis-a-vis the bankruptcy rules. The rule is clear: the Bankruptcy Code prohibits postpetition interest on unsecured claims.

11 U.S.C. § 502(b)(2). The Arizona judgment is an unsecured claim.[1] The interest accrued on the judgment after the filing of the bankruptcy is postpetition interest. What then is the majority's basis for deviating from the rule? None, other than creating an unprecedented exception to the rule.[2]

The Arizona judgment is not the anomaly that the majority describes. To put the judgment in context, it is necessary to go back to the beginning of the litigation. The suit stems from an intrafamily feud over AMERCO, the holding company for U–Haul International, Inc. and several related corporations. The Samuel Shoen Interests (the Creditors) claimed that the Edward Shoen Interests (the Debtors) breached their fiduciary duties and engaged in other tortious conduct. The genesis of this appeal lies in the Arizona court's initial determination that, in order to avoid a double recovery, the Samuel Shoen Interests would have to choose either to accept a money judgment for their claims or to dismiss the suit and retain their stock. In other words, they had to elect a remedy at the outset and then live by that decision. They chose to seek the judgment.[3]

The jury awarded the Samuel Shoen Interests $1.48 billion in compensatory damages (based on a finding of a per share decrease in value from $81.12 to $0.48) and $70 million in punitive damages against Joe Shoen. The court found that the verdict was based on an inflated valuation of the company and issued a remittitur, requiring the Samuel Shoen Interests to accept $461,838,000 in compensatory damages and $7 million in punitive damages or to have a new trial on damages. The Samuel Shoen Interests accepted the re-

mittitur on February 14, 1995 and judgment was entered on February 21, 1995.

The terms of the judgment were as follows:

> Upon payment or tender of the total dollar amount set forth above [$461,838,-000], together with accrued interest and taxable costs, all Plaintiffs' shares of AMERCO Common Stock identified above shall be transferred to Defendants or their designees.
>
> Plaintiffs are hereby awarded interest on the amount of this Judgment ($461,-838,000) at the rate of ten percent (10%) per annum until paid, said interest to accrue from February 14, 1995.

In addition to the $461,838,000 "Judgment," the Arizona court awarded the Samuel Shoen Interests interest from the date of their acceptance of the remittitur (February 14, 1995) at the Arizona statutory rate. *See* A.R.S. § 44–1201(A) (1998) (fixing interest on judgments at 10 percent per ·annum). As is typical, postjudgment interest was to accrue until the judgment was paid. Most importantly, in keeping with the election of remedies, the judgment required the Samuel Shoen Interests to transfer their shares of AMERCO stock to the Edward Shoen Interests upon payment of the $461,838,000 "together with accrued interest and taxable costs."

Although the stock transfer provision complicates the judgment somewhat, it does not, as the majority holds, create a new brand of "judicial sale." The majority apparently believes that unless postjudgment interest is collected, the Samuel Shoen Interests will not have received full compensation. However, this ignores the intervention of the bankruptcy filing. In a

---

1. There is no dispute that the Samuel Shoen Interests, as judgment creditors, but not lien creditors, hold unsecured claims. *See Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 786 F.2d 794, 799 (7th Cir.1986).

2. There are two exceptions to 11 U.S.C. § 502(b)(2): first, where the debtor is actually solvent, 11 U.S.C. § 726(a)(5); and second, where the creditor is oversecured, 11 U.S.C.

§ 506(b). *See In the Matter of Fesco Plastics Corp., Inc.*, 996 F.2d 152, 155–56 (7th Cir. 1993). While there may be a question as to the solvency of the debtor here, *see post*, the majority relies upon neither of these recognized exceptions in reaching its result.

3. We offer no view whether such election was appropriate or required.

typical judgment, the creditor receives the judgment amount plus postjudgment interest. The postjudgment interest is generally a creation of state statute designed to make the debtor whole if payment is delayed. A satisfaction of judgment is not entered until the judgment and interest are paid in full, just as here the stock would not be transferred until the judgment amount plus interest were paid. However, if bankruptcy is filed after entry of the judgment, postjudgment interest stops accruing and the allowed claim becomes the judgment amount plus any interest accrued prior to the bankruptcy filing. The same analysis should apply to the Arizona judgment here.

This case is not dissimilar from one in which the plaintiff obtains a prejudgment writ of attachment against the property of the debtor. In that case, where the plaintiff obtains a money judgment for more than the amount of the collateral, and the judgment debtor thereafter files for bankruptcy, the lienholder holds an undersecured claim and is not entitled to postpetition interest on the judgment. *See* 11 U.S.C. §§ 502(b)(2), 506(b); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (finding that under § 506(b), "the undersecured creditor ... falls within [§ 502(b)(2)'s] general rule disallowing postpetition interest."). That result is not changed by the fact that, absent the bankruptcy filing, payment of any postjudgment interest awarded would be required before the judgment could be satisfied and the writ extinguished.

Guidance may also be found in our analysis in *In re Del Mission Ltd.*, 998 F.2d 756, 757 (9th Cir.1993). There the bankruptcy court approved the sale of Del Mission's liquor license after payment of "'necessary' amounts" to the California Employment Development Department ("EDD") and the State Board of Equalization ("Board"). EDD and the Board claimed a statutory right not only to all unpaid taxes and penalties, but also to accrued interest before they would transfer the license. We rejected their claim for interest, holding that "[a]uthority to pay 'necessary' amounts does not ... permit payment of prohibited postpetition interest on prepetition taxes." *Id.* at 757.

## II.

### Section 502(b)(2) Disallows Postpetition Interest On The Judgment

Here, the majority creates confusion by reading into the stock transfer provision the requirement that all postjudgment interest be paid before the Edward Shoen Interests may receive the stock. That position fails (1) to accord due deference to the Bankruptcy Code's disallowance of postpetition interest on unsecured claims, (2) to acknowledge the precise valuation of the stock undertaken by the Arizona court, and (3) to account for the analytical distinction between prejudgment and postjudgment interest.

Section 502(b)(2) provides for the allowance of certain claims against a bankrupt estate "except to the extent that ... such claim is for unmatured interest."[4] 11 U.S.C. § 502(b)(2); *see also In re Del Mission*, 998 F.2d at 757 ("The Code ... prohibits claims for postpetition interest on unsecured claims."); 4 Lawrence P. King, Collier on Bankruptcy ¶ 502.03(3)(a) (15th ed.1996) (§ 502(b)(2) suspends "the accrual of interest on claims as of the date of the filing of the petition.").[5] Neither

---

4. "Unmatured" interest is interest that is "not yet due and payable" at the time a petition is filed. 4 Lawrence P. King, Collier on Bankruptcy ¶ 502.03(3)(a) (15th ed.1996).

5. The rationale for the proscription on postpetition interest is that it promotes certainty and eases administration of the estate by setting a date on which claims are fixed. *See Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 164, 67 S.Ct. 237, 91 L.Ed. 162 (1946).

the BAP nor the majority explains why § 502(b)(2) is inapplicable to this case. By ignoring § 502(b)(2), the majority violates the well established principle that a creditor's state law rights are subordinate to the operation of federal bankruptcy law. *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (operation of the Bankruptcy Code is "unimpeded by contrary state law" where the "meaning of the Bankruptcy Code's text is itself clear"); *In re Mankin,* 823 F.2d 1296, 1308 (9th Cir.1987) ("Congress can, and often has, exercised its bankruptcy power to modify, or even abrogate, creditors' rights in the independent federal interest of providing an equitable restructuring or liquidation of a bankrupt's estate."). Whereas prepetition interest is governed by state law, the Supreme Court reminds us that entitlement to postpetition interest "has long been decided by federal law." *Vanston,* 329 U.S. at 163; *see also Bursch v. Beardsley & Piper,* 971 F.2d 108, 114 (8th Cir.1992) ("[O]nce a bankruptcy petition is filed, federal law, not state law, determines a creditor's rights."). The majority reads the terms of a state court judgment as trumping federal bankruptcy law—this is the tail wagging the dog.

Nothing in the stock transfer provision of the judgment permits us to disregard § 502(b)(2)'s clear prohibition against the accrual of postpetition interest on unsecured claims. By its very terms, the judgment provides for transfer of the stock upon payment of the $461,838,000, "together with *accrued interest* and taxable costs." Under § 502(b)(2), by operation of the bankruptcy laws, the postjudgment interest stopped accruing once the petitions were filed. Therefore, the finding that no postpetition interest was due complies both with the terms of the judgment and with § 502(b)(2).

The majority's claim that the stock transfer provision compels a different result ignores the careful evaluation of the stock undertaken by the Arizona court.

The trial judge undertook a reasoned and well documented path to reduce the staggering jury verdict to the remittitur amount. The court first determined the most reliable valuation of AMERCO at the time of the takeover attempt ($930 million) and then divided that amount by the percentage of the Samuel Shoen Interests' combined ownership at that time (49.66%). The resulting figure ($461,838,000) reflected the "value of Plaintiffs' shares" and constituted the "judgment." The judgment (remittitur) amount was a proxy for the damages caused by the breach of fiduciary duty and other claimed wrongs. Thus, by paying the judgment amount of $461,838,000 plus prejudgment interest, the Edward Shoen Interests paid the full amount of compensation awarded by the Arizona court in exchange for the Samuel Shoen Interests' stock. The Edward Shoen Interests did not, as the majority suggests, receive the stock for less than its value. Unlike the majority, I see no Pangloss at work here.

Finally, the majority reaches a different conclusion, in part, because it fails to distinguish between prejudgment and postjudgment interest. Prejudgment interest constitutes part of the compensation awarded for a plaintiff's loss. *See Osterneck v. Ernst & Whinney,* 489 U.S. 169, 175, 109 S.Ct. 987, 103 L.Ed.2d 146 (1988) ("[P]rejudgment interest is an element of [the plaintiff's] complete compensation.") (internal quotation marks and citation omitted); *In re Stoecker,* 5 F.3d 1022, 1027 (7th Cir.1993) ("[P]rejudgment interest is part of the relief sought by the plaintiff to rectify the defendant's wrong."). In contrast, postjudgment interest serves an entirely different purpose: "to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835–36, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Here, the interest awarded before the judgment was entered

on February 21, 1995 should be characterized as prejudgment interest. The postjudgment interest component of the judgment—interest awarded after entry of the judgment—was not part of the compensation awarded in exchange for the Samuel Shoen Interests' stock.[6] Accordingly, there was no requirement that such interest be paid in the face of § 502(b)(2)'s disallowance of postpetition interest on unsecured claims.[7]

## III.

### Conclusion

Although I would reverse the decision of the BAP, the Edward Shoen Interests would hardly be home free under my analysis. A key hurdle would remain because the solvency of the debtor is an exception to the application of § 502(b)(2), *see* 11 U.S.C. § 726(a)(5); *Timbers of Inwood Forest*, 484 U.S. at 379, and cannot be determined on the record before us. Accordingly, I would reverse and remand to the BAP with instructions to remand to the bankruptcy court for further proceedings consistent with the above analysis, including a determination of the Edwards Shoen Interests' solvency at the time they filed their petitions.

ATTACHMENT

APPENDIX A

UNITED STATES BANKRUPTCY

APPELLATE PANEL

OF THE NINTH CIRCUIT

In re Edward J. Shoen, et al., Debtors.

---

**6.** This conclusion is further buttressed by the fact that whereas the merits of the dispute were governed by the substantive law of Nevada, the judge awarded interest pursuant to Arizona procedural law.

**7.** Of course, the fact that postjudgment interest merely penalizes for the delay in paying the judgment does not absolve the usual judgment debtor of the obligation to pay it. How-

Edward J. Shoen, James P. Shoen, Aubrey K. Johnson, John M. Dodds, William E. Carty, and AMERCO, Appellants/Cross–Appellees,

v.

Samuel W. Shoen, Katabasis International, Inc., Michael Shoen, Mickl, Inc., Katrina Shoen Carlson, Kattydid, Inc., Cemar, Inc., and Cecilia M. Shoen Hanlon, Appellees/Cross–Appellants.

BAP No. AZ–96–1884–KJRy.

No. AZ–96–1911.

Bk. No. 95–1430–PHX–JMM (Jointly Administered Under This Case Number).

Argued and Submitted on July 24, 1997, at Phoenix, Arizona.

Decided Oct. 22, 1997.

Appeal from the United States Bankruptcy Court for the District of Arizona.

Before: KLEIN,[1] JONES and RYAN, Bankruptcy Judges.

MEMORANDUM

JAMES M. MARLAR, Bankruptcy Judge, Presiding.

INTRODUCTION

This appeal is a $55 million mopping-up operation in a $1.5 billion family feud that has been waged for longer than World Wars I and II combined. It requires a determination of whether the bankruptcy court correctly concluded that interest accrues postpetition on a $469 million judgment for breach of fiduciary duty (reduced on remittitur from $1.48 billion) and, if so, whether it correctly ruled that $55 million

---

ever, because the postjudgment interest awarded by the Arizona court instantly became *postpetition* interest when the Edward Shoen Interests filed their bankruptcy petitions on the day the judgment was entered, such interest is disallowed under § 502(b)(2).

**1.** Honorable Christopher M. Klein, Bankruptcy Judge for the Eastern District of California, sitting by designation.

was the proper amount of such interest under the terms of a confirmed, stipulated plan of reorganization.

The feud relates to control of the corporation named AMERCO, which is owned primarily by members of the Shoen family, which corporation owns a number of subsidiary corporations, including U–Haul International, Inc.

The feud began when the Shoen family divided into factions behind Leonard S. Shoen ("Leonard"), the founder of AMERCO, and Edward J. Shoen ("Joe"), one of Leonard's thirteen children by several marriages. Leonard and Joe differed about how to run the family business. In 1986, Leonard left the AMERCO management team and, with several of his other children,[2] began secretly orchestrating a hostile takeover. When Joe and his faction,[3] owning slightly fewer shares than Leonard's faction, learned of the plot, they responded by exploiting their status as corporate directors to have additional AMERCO stock issued to five key employees, and to establish a "poison pill" strategy that made it impossible for Leonard to wrest control from Joe. When the dust settled, the takeover attempt was blocked; Leonard's faction controlled 47 percent of the common stock, and Joe's faction controlled 44 percent. Joe was ensconced as the Chairman of the Board of AMERCO with his faction firmly in control. The feud was on.[4]

## FACTS

This appeal and cross-appeal stem from litigation that was commenced in 1988, when members of Leonard's faction ("plaintiffs")[5] sued members of Joe's faction, including Joe, Paul F. Shoen, James P. Shoen, Aubrey K. Johnson, William E. Carty, John M. Dodds, and AMERCO ("defendants") in the Maricopa County, Arizona, Superior Court for, inter alia, breach of fiduciary duty. Plaintiffs claimed that their stock was rendered worthless by defendants' conduct. This litigation has come to be known as the "Share Case," and the cross-appellants in this appeal are sometimes referred to as the "Share Case plaintiffs."

The state court, perhaps in an effort to reduce the opportunity for further feuding, ruled during the trial that, if the plaintiffs prevailed and were awarded damages on their worthless stock theory, there would be a "double recovery" inherent in permitting the plaintiffs to collect money damages and to retain their stock. Hence, before allowing the case to go to the jury, the state court made the plaintiffs choose between either: (1) dismissing the case and retaining their stock; or (2) surrendering their stock upon payment of an amount to be determined by the jury. The plaintiffs chose the latter option, agreed that surrender of stock would be a condition of a money judgment, and presented their case to the jury.

The jury returned a verdict finding that the defendants had, inter alia, breached their fiduciary duties, which resulted in the diminution of value of plaintiffs' stock by approximately $1.48 billion. The jury then

**2.** Leonard's faction included his children Sam, Michael, Mary Anna, Cecilia, Theresa, and Katrina, who then owned 49.66 percent of AMERCO common stock.

**3.** Joe's faction included James Shoen, Paul Shoen, and other family members, who together, held a slightly smaller block of AMERCO common stock.

**4.** The details are more comprehensively stated in the bankruptcy court's published opinion explaining its refusal to confirm plans

previously proposed by the debtors. *In re Shoen,* 193 B.R. 302 (Bankr.D.Ariz.1996).

**5.** The plaintiffs in the state court action included Samuel W. Shoen, Mary Anna Shoen–Eaton, Cecilia M. Shoen Hanlon, Katrina M. Shoen, Theresa Romero, Michael L. Shoen, and the following Arizona corporations: Samwill, Inc.; Cemar, Inc.; Kattydid, Inc.; Thermar, Inc.; L.S.S. Inc.; Mickl Inc.; and Maran Inc.

Leonard Shoen does not appear to have been a plaintiff in the state court litigation.

awarded the plaintiffs $1.48 billion in compensatory damages against all defendants, and $70 million in punitive damages against Joe.

Following a remittitur that was accepted by the plaintiffs, the state court entered a judgment that reduced compensatory damages to $461,838,000 and punitive damages to $7,000,000. The judgment was entered on February 21, 1995.

## BANKRUPTCY PROCEEDING

The same day as the state court judgment was entered, February 21, 1995, Joe, James P. Shoen, Aubrey K. Johnson, John M. Dodds, and William E. Carty ("debtors"), each of whom was a director of AMERCO and a judgment debtor in the state court proceeding, filed chapter 11 bankruptcy petitions, which were promptly ordered jointly administered.

The debtors proposed several plans of reorganization that provided for two options: (1) payment of the state court judgment in kind with property worth $461,-838,000 plus 10 percent interest, in lieu of money; or (2) payment of $350 million cash. In either event, AMERCO, a non-debtor, would indemnify the debtors.

Ultimately, the bankruptcy court was asked, over objection, to confirm plans containing the property swap proposal. The court, in a published opinion, refused to confirm the proposed plans "because they include provisions which require the Share Case Plaintiffs to surrender their valuable AMERCO common stock without a corresponding requirement on the part of the Debtors to satisfy, in cash, the explicit terms of the Share Case Judgment." *In re Shoen,* 193 B.R. 302, 317 (Bankr.D.Ariz.1996).

The bankruptcy court reasoned that the state court judgment in the Share Case, while not an executory contract, must be analyzed as such because it was more than a mere money judgment and required performance from both parties. Such performance would require the defendants to pay the outstanding balance of the compensatory damages award, which includes interest accruing at 10 percent, and taxable costs. The plaintiffs, in turn, would be required under the state court judgment to transfer their AMERCO shares back to the defendants (specifically, to AMERCO), upon payment of the judgment debt.

The bankruptcy court determined that the transfer of stock was conditioned upon the full payment of the state court judgment and concluded that the obligation to transfer stock was a "judicially-ordered right to acquire property for a pre-arranged price." *Id.* at 314. As such, the right to acquire the specific property of another is a creature of state law that cannot be significantly modified in bankruptcy. *Id.* at 316. Consequently, the bankruptcy court held that the proposed plans' attempt to satisfy the state court judgment in kind by transferring property of allegedly comparable value was insufficient.[6]

The bankruptcy court also found that postpetition interest, which is generally

---

6. The bankruptcy court, lamenting the dismal prospects for any settlement, counseled:

[G]iven the history of this dispute, it is certainly possible that a consensual plan may never be achieved under any circumstance. If that be the case, then these parties will probably be locked in perpetuity in the purgatory of continual conflict. However, a compromise such as mentioned above [debtors' payment of $350 million in cash and satisfaction of the balance either by (I) transferring property with an indisputable value equal to the remaining balance, or (ii) generating cash by selling a non-controlling block of Plaintiffs' stock] could be an acceptable solution for all concerned and is the *only* way to avoid the months, if not years of further litigation and appeals which will undoubtedly follow this and other decisions in this, and other cases....

*In re Shoen,* 193 B.R. at 318 n. 19.

disallowed in bankruptcy pursuant to § 502(b), subject to a solvency exception, would be required in this instance to satisfy the terms of the state court judgment's judicial sale of the stock.[7]  *Id.* at 317. Hence, plan confirmation was denied on March 4, 1996.

The denial of confirmation led to a prompt settlement that was embodied in consensual modifications to the plans of reorganization that the court had refused to confirm on March 4, 1996. These modifications caused the confirmation hearing to be resumed and concluded on March 7, 1996. The stipulated Order Confirming Plan was entered March 15, 1996, and was not appealed.

In the compromise modifications, the debtors and the Share Case plaintiffs agreed to disagree about postpetition interest by means of the functional equivalent of "bonding off" the disputed interest utilizing an escrow, with respect to which the bankruptcy court would determine the appropriate sum, if any, in a separate proceeding. Accordingly, the plans were modified to provide for: (1) full payment by AMERCO of the principal amount of the state court judgment in cash (Appellants' Excerpts of Record ("E.R.") 00955–00956); and (2) funding by AMERCO of an escrow account to assure payment of any postpetition interest that is finally adjudicated, in all litigation where the payment of postpetition interest is at issue, to be owed to the plaintiffs. E.R. 00948–00949. The modified plans provided for transfer of plaintiffs' stock to AMERCO. E.R. 00959–00964 (treatment of Class 3 claims).

The subsequent proceeding to determine the amount to be put into escrow was heard by the bankruptcy court on July 19, 1996, at the end of which it announced its ruling orally on the record. E.R. 01117–01145.

In that subsequent proceeding, the bankruptcy ruled that: (1) interest did continue to accrue postpetition; (2) that the "amount(s) required to be escrowed" would be the amount of postpetition interest accrued through the date of payment of the principal amount of the state court judgment, approximately $55 million; and (3) the plaintiffs were bound by their stipulation to the confirmed plans of reorganization that allocated the Effective Date Payoff to constitute full settlement and satisfaction of the judgment principal amount (plus interest from the date the remittitur was announced to the date of the petition) and that created the Escrow Account as a repository for the amount of unpaid postpetition interest, if any, that the court later determined to be owed. E.R. 01141–01142; Second Amended and Restated Debtors' Plans of Reorganization, ¶¶ 2.44, 2.45, 2.49, and 2.26A, E.R. 00790–00796.

The actual order resolving the subsequent proceeding was entered September 12, 1996. The bankruptcy court deter-

---

**7.** There was no discussion in the appellate briefs whether interest would continue to accrue postpetition on the theory that the debts would be nondischargeable under 11 U.S.C. § 523(a)(4) and (a)(6).

However, at the hearing on this appeal, plaintiffs' counsel represented that nondischargeability actions are pending, and indicated that if his clients lose the appeal, they expect to litigate the nondischargeability actions.

We note in this connection that the jury in the state court action specifically found that debtors committed fraud, acted with malice, and breached their fiduciary duties. Although such findings suggest nondischarge-

ability in neon lights, we are not presented with and do not purport to decide that question in this appeal. If the debts were held to be nondischargeable, then plaintiffs would be entitled to postpetition interest at the state court judgment rate. *See Bruning v. United States,* 376 U.S. 358, 360, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964) (postpetition interest on a nondischargeable tax debt is nondischargeable).

As discussed, *infra,* it is doubtful that the nondischargeability actions retain vitality following plaintiffs' agreement to a plan that pays the principal in full and that substitutes an escrow account for post-judgment interest. However, this precise issue is not before us.

mined that interest did run postpetition at the Arizona 10 percent judgment interest rate until the escrow account was funded and determined that, once funded, interest would cease accruing. Thereafter, the earnings on the escrow account would be, according to the agreement of the parties, the sole source of subsequent increases, which earnings might be more or less than 10 percent. The $55 million escrow account was promptly funded.

On September 16, 1996, the debtors filed a notice of appeal in which AMERCO joined. They challenge the portion of the bankruptcy court decision that requires debtors to pay postpetition interest to plaintiffs to satisfy the state court judgment's stock surrender provision.

Plaintiffs cross-appealed the portion of the bankruptcy court decision that held the plaintiffs to their stipulation, to accept the escrow account and its earnings in lieu of continued accrual of postpetition interest.[8]

### JURISDICTION

We have jurisdiction under 28 U.S.C. § 158. The order confirming the plan of reorganization and attendant implementing order fixing the amount to be placed in escrow are final orders.[9]

### STANDARD OF REVIEW

A bankruptcy court's conclusions of law are reviewed de novo and its findings of fact are upheld unless clearly erroneous.

*Otto v. Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir.1997); *Feder v. Lazar (In re Lazar),* 83 F.3d 306, 308 (9th Cir.1996).

### ISSUES ON APPEAL

Whether interest at the Arizona judgment interest rate continued to accrue postpetition under the facts of this case.

### ISSUE ON CROSS–APPEAL

Whether interest at the Arizona interest rate ceased to accrue when the Escrow Account created by section 2.26A of the confirmed plans of reorganization was funded.

### DISCUSSION

#### I.

The issue of whether the bankruptcy court erred in ruling that postpetition interest on the state court judgment was an enforceable condition of the stock surrender provision in that judgment depends upon the characterization of the state court judgment as a judicially mandated sale of stock.

#### A.

"Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Consequently, state law determines the validity of claims related to property inter-

---

8. On oral argument of this appeal, the plaintiffs' counsel conceded repeatedly that this was precisely what he agreed on behalf of his clients in what he repeatedly described as a "late night." And he conceded that the gravamen of the plaintiffs' cross-appeal is the desire to be relieved of the burden of this agreement.

9. This could, however, be part of a piecemeal appeal. The Share Case plaintiffs expect to pursue post-judgment interest at the Arizona judgment rate by way of nondischargeability actions in the event they lose on their appeal. Their theory would be that interest accrues

postpetition on nondischargeable debts. As to the appeal, the subsequent nondischargeability proceeding would be unnecessary so long as the bankruptcy court's ruling remains undisturbed on the question of entitlement to postpetition interest. Whether such actions survive plan confirmation is an issue for another day. But, as to the cross-appeal, the effect of the agreement by the cross-appellants to substitute the escrow account for ongoing interest will plainly be a key issue in any subsequent litigation asserting that interest continues to accrue at the Arizona judgment interest rate instead of the amounts that actually are accrued in the escrow account.

ests. *Joseph F. Sanson Inv. Co. v. 268 Limited (In re 268 Limited),* 789 F.2d 674, 677 (9th Cir.1986) (citing *Butner* ); *Spencer v. Pugh (In re Pugh),* 157 B.R. 898, 901 (9th Cir.BAP 1993) (citing *Grogan v. Garner,* 498 U.S. 279, 283, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Johnson,* 756 F.2d 738, 741 (9th Cir.), *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985)). *See also* 4 COLLIER ON BANK-RUPTCY ¶ 502.03[2][b] (Lawrence P. King, et al., eds., 15th ed. rev.1997).

Where there is a judgment of an Arizona court of competent jurisdiction, the federal courts must give it the same full faith and credit as would be afforded in Arizona courts. 28 U.S.C. § 1738; *Swift v. Bellucci (In re Bellucci),* 119 B.R. 763, 769 (Bankr.E.D.Cal.1990). In this connection, we are not permitted to review the merits of the state court's judgment. Thus, for example, we do not consider whether the state court was correct in ruling that permitting the plaintiffs to retain their stock and recover money damages would have offended any "double recovery" rule. The bankruptcy court, however, was entitled to construe the terms and purposes of the underlying state court judgment for purposes of claim treatment under the Bankruptcy Code. *See In re Holm,* 931 F.2d 620, 623 (9th Cir.1991). A state court judgment is considered to be state law for purposes of determining the validity of claims. *See Punton v. Chapman (In re Chapman),* 125 B.R. 284, 286 (Bankr.S.D.Cal.1991); 49 C.J.S. *Judgments* § 3 (1997). Strict compliance with the terms of an Arizona judgment are required to satisfy an Arizona judgment. *Koepke v. Carter Hawley Hale Stores, Inc.,* 140 Ariz. 420, 682 P.2d 425 (Ariz.Ct.App.1984).

### B.

The bankruptcy court construed the state court judgment as creating two, independent mutual obligations based on the following language in the state court judgment:

1. The plaintiffs, each of them, shall have and recover judgment against the Defendants Edward J. Shoen, Paul F. Shoen, James P. Shoen, William E. Carty, Aubrey K. Johnson, and John M. Dodds, jointly and severally [in the amount of $461,838,000].

2. Upon payment or tender of the total dollar amount set forth above, together with accrued interest and taxable costs, all Plaintiffs' shares of AMERCO Common Stock identified above shall be transferred to Defendants or their designees.

3. Plaintiffs are hereby awarded interest on the amount of this Judgment ($461,838,000) at the rate of ten percent (10%) per annum until paid, said interest to accrue from February 14, 1995.

E.R. 00016–00018 (citing Judgment on Special Verdict and Remittitur, dated February 21, 1995, at 3).

The bankruptcy court characterized the language in paragraph 1 that ordinarily gives rise to an unsecured debt, as being inextricably intertwined with paragraph 2, the stock surrender provision, in a manner that created "a judicially-set sale price for stock upon payment of a specific sum." E.R. 00750. The bankruptcy court held that the state court clearly set the terms for the acquisition of the stock, which it viewed as a property right. Consequently, plaintiffs contend that, although interest accruing on a postpetition, unsecured debt is generally disallowed in bankruptcy under § 502(b)(2), the continued accrual of interest is nevertheless a condition for the acquisition of the stock. As such, postpetition interest was required in order to satisfy the terms of the judgment.

Whether postpetition interest is allowed in this instance is dependent upon how the state court judgment is characterized. Plaintiffs emphasize the intertwined nature of the obligations set forth in the state court judgment-the latter obligation

creating the terms that property can be acquired.

The debtors, in contrast, characterize the stock surrender requirement as merely ministerial and incidental to the payment of the claim. They contend that the filing of proofs of claim constitutes the plaintiffs' agreement to be bound by the bankruptcy court's exclusive authority to allow or disallow a claim. Consequently, debtors contend, payment pursuant to the chapter 11 plan satisfies the plaintiffs' claims under the state court judgment, including the requirement that plaintiffs surrender the stock, notwithstanding the disallowance of postpetition interest under § 502(b).

We conclude the bankruptcy court did not err in construing the state court judgment as constituting a judicially prescribed sale of stock. Plaintiffs were allowed to present their case to the jury in state court on the express condition that they agree to surrender their stock in exchange for the amount of the damages award. Hence, the compensatory damages award is more than a mere unsecured debt that ordinarily would be discharged by payment of the entire allowed amount of plaintiffs' claim through the chapter 11 plans.

The judgment requires the surrender of the stock only upon payment or tender of the $461,838,000, together with accrued interest at the judgment rate of 10 percent per year and taxable costs, until paid. E.R. 00018. This right to acquire the property of another (i.e., AMERCO stock) is strictly a creature of state law. *See Morton v. Nat'l Bank of New York (In re Morton)*, 866 F.2d 561, 563–64 (2d. Cir. 1989). Under state law, "[t]he party who claims the benefit of a judgment rendered in his favor must comply with any terms or conditions which it imposes on him, and

failure to do so will destroy the effect of the adjudication." 50 C.J.S. *Judgments* § 545 (1997) (citations omitted).

Although the allowed claims (principal and prepetition interest) may have been satisfied for purposes of bankruptcy law, that does not dispose of the entire judgment. The terms set forth in the state court judgment as a condition for the stock transfer required payment of interest at 10 percent.

While liens may indeed be diminished through a chapter 11 plan, property that does not belong to the bankruptcy estate, such as the plaintiffs' shares of stock, may not be diminished. A debtor cannot use bankruptcy to deprive a creditor of its state law property rights. *In re Wetzler*, 192 B.R. 109, 117–18 (Bankr.D.Md.1996). Here, the plaintiffs own about 47 percent of the common stock of AMERCO, which is a very significant property right. Thus, the bankruptcy court correctly held that postpetition judgment interest, although such interest would be disallowed if the debts are dischargeable, was nevertheless required to effectuate the terms of the sale of stock.

In addition, the bankruptcy court correctly held that debtors' insolvency was irrelevant because even if debtors were insolvent, postpetition interest is nevertheless required to satisfy the peculiar terms of the state court judgment's stock surrender provision.[10]

## II.

The plaintiffs concede in their crossappeal that they stipulated to accept the payment under the plan and the payment into the escrow account in lieu of full payment of the state court judgment with interest through the actual date of the last

---

**10.** As we discuss later in this Memorandum, the bankruptcy court could reasonably have concluded that the debtors were all solvent as a result of AMERCO's indemnification obligation. If the debtors were solvent, then (even if the bankruptcy court were to be held to have erred in concluding that there was a

judicially-mandated sale of stock, or if the debts were to be found to be dischargeable) interest would accrue at the federal judgment interest rate pursuant to 11 U.S.C. § 726(a)(5). However, because the bankruptcy court did not decide this issue, we merely note its presence on the landscape.

payment. Plaintiffs' counsel says that the stipulation was the result of a "late night," and wants to be excused from the agreement so that interest may be claimed for periods after the escrow account was funded.

Although the plaintiffs' appellate brief contends that the bankruptcy court erroneously failed to consider a written stipulation entered into between the parties on March 6, 1996, when it confirmed the Second Amended and Restated Debtors' Plan of Reorganization, plaintiffs' counsel abandoned that point at oral argument by conceding that the written document was not the final deal.

In light of these concessions, we understand the gravamen of the cross-appeal to be that the plaintiffs should be excused from a bad decision even though the bankruptcy court did not err in its finding of fact that the plaintiffs agreed that the deposit of postpetition interest into the escrow account satisfied the stock surrender provision of the state court judgment.

In March 1996, the Second Amended And Restated Debtor's Plan of Reorganization was confirmed subject to three modifications. Section A. (ii) states the following pertinent modification:

> (ii) Subsection (b) of Section 2.26A, which is the Section defining the Escrow Account, is supplemented to provide that the amount(s) required to be escrowed will be determined pursuant to a separate order of the Bankruptcy Court-all as provided in the *"Reporter's Transcript Of Proceedings,"* dated March 6, 1996, which the Debtor filed with the Bankruptcy Court at the March 7, 1996

session of the Confirmation Hearing. Such separate order of the Bankruptcy Court (including any appeal(s) thereof) will not affect the finality of this Confirmation Order or the provisions of the Plan regarding the payments of the unpaid Share Case Claims and the surrenders or transfers of the Shareholder Plaintiffs' AMERCO common stock to AMERCO as the Debtor's designee.

Order Confirming Plan, E.R. 00763–000764.

Additionally, subsection (b) of section 2.26A of the Second Amended And Restated Plan states: "If the Bankruptcy Court orders that post-Petition Date interest must be paid under the Share Case Judgment on the unpaid Share Case Claims, AMERCO will deposit cash in the Escrow Account sufficient to pay such post-Petition Date interest." *Id.* at E.R. 00790.

Plan section 2.49 provides that the Effective Date Payoff (which is separate from the Escrow Account deposited) constitutes full settlement and satisfaction of the Share Case Claims which are defined to include the Share Case Judgment.

As noted, plaintiffs contended in their brief that the bankruptcy court erroneously failed to consider the purported stipulation that they say was entered into by the parties when it confirmed the plans of reorganization. Essentially, plaintiffs initially argued on appeal that they only agreed to withdraw their objections to confirmation of debtors' plans upon compliance with the terms of the purported stipulation set forth in a March 6, 1996, letter on Osborn Maledon stationery. Appellees' Supplemental Excerpts of Record ("Supp. E.R.") 00186–00197.[11]

---

11. The March 6, 1996 letter states the pertinent terms of the purported stipulation:

The unpaid Share Case Plaintiffs contend that the Debtors have not correctly calculated the amount of interest to be paid on the Share Case Judgment. The unpaid Share Case Plaintiffs contend that the Effective Date Payoff cannot be applied first to the

principal amount of the Share Case Judgment and must be applied first to interest accrued on the Share Case Judgment. Therefore, the unpaid Share Case Plaintiffs contend that, on and after the Effective Date, there will be a balance of the Share Case Judgment remaining upon which interest will continue to accrue at the rate of

On March 7, 1996, the day after the parties entered into the stipulation, a plan confirmation hearing was held. The plaintiffs' counsel, at oral argument before us, admitted that the purported stipulation was not included in the plan and that this was no mistake. The court subsequently confirmed debtors' Second Amended and Restated Plans of Reorganization, subject to the above-stated modifications. The court noted that the plaintiffs withdrew their objection to confirmation of the plan pursuant to the record established by the *"Reporter's Transcript Of Proceedings,"* dated March 6, 1996. E.R. 00765. However, the Order Confirming Plan does not refer to the purported stipulation. Indeed, in the March 6, 1996, proceeding in the bankruptcy court in which the settlement was announced, there was a colloquy in which AMERCO insisted, notwithstanding the plaintiffs' March 6 letter, that the terms of the plans control and were not to be modified. The plaintiffs, through counsel, agreed. Supp. E.R. 00192, at lines 2–24.

Consequently, pursuant to a Hearing On Post–Petition Interest On The Unsecured Share Case Judgment Under The Debtors' Confirmed Plans And Escrow Requirements of Plans, on July 19, 1996, the bankruptcy court held, orally on the record, that the plaintiffs stipulated to the terms of the confirmed plans in which the deposit of interest that accrued through the effective date of the plans or payment satisfied the terms of the state court judgment. The bankruptcy court found that there is no requirement that AMERCO must make periodic payments to keep the earned interest on the escrowed funds at a figure equaling 10 percent per annum, which is the judgment rate. E.R. 01139–01143.

Finally, in its Order Adjudicating: (1) The Reorganized Debtors' Obligations To Pay Postpetition Date Interest On The Respective Share Case Judgment Principal Accounts; And (2) The Proper Calculation Of The Escrow Account, the bankruptcy court held that:

> [t]he Escrow Account established pursuant to the Reorganized Debtors' confirmed Plans shall be, and hereby is, determined to be funded fully with respect to each of [the plaintiffs' classes] under the Plans when each of the respective amounts of Post–Petition Date Interest accrued on the respective Share Case Judgment Principal Amounts is deposited in the Escrow Account. Thereafter, the Reorganized Debtors shall not be obligated to pay any additional interest on the respective fully paid Share Case Judgment Principal Amounts or on the escrowed Post–Petition Date Interest, *provided, however, that* any interest earned on the escrowed funds shall be held and administered as part of the Escrow Account and disbursed to the party ultimately and finally adjudicated

10% per annum while the Debtors are appealing the Bankruptcy Court's ruling on interest (the "Unpaid Balance").

The Debtors and AMERCO contend that the Effective Date Payoff as applied pursuant to the Plan is proper, and that, upon the payment to the unpaid Share Case Plaintiffs of the Effective Date Payoff and the deposit into the Escrow Account, the balance of the Share Case Judgment is satisfied in full.

The unpaid Share Case Plaintiffs, the Debtors and AMERCO agree to submit this issue to the Bankruptcy Court for determination after confirmation of the plans. If the Bankruptcy Court decides that there is an Unpaid Balance upon which interest continues to accrue, the Debtors and AMERCO agree, on an annual basis, to deposit into the Escrow Account additional sums accrued on the Unpaid Balance. The amount to be deposited on an annual basis will be an amount equal to the difference between the interest or other income received on the funds in the Escrow Account and the accrued interest at the rate of 10% per annum on the Unpaid Balance.

The Escrow Account will continue to be held, administered and distributed in accordance with the Plan. The issues reserved pursuant to the Plan will include *both* whether post-Petition Date interest must be paid at all *and,* if so, the correct computation thereof in light of the dispute described above.

Supp. E.R. 00195–00196.

to be entitled to the escrowed funds in accordance with Section 2.26A of the confirmed Plans.

E.R. 01195.

Plaintiffs' counsel, as noted, repeatedly conceded during oral argument that the plaintiffs agreed to accept the $55 million in the escrow account plus any accrued interest in the account, in lieu of payment of interest pursuant to the state court judgment rate, in the event that plaintiffs were successful on appeal. Plaintiffs' counsel further admitted that the purported stipulation was not included in the plan of reorganization. However, he argued that we should consider all of the documents as a whole (including the purported stipulation), and not just the confirmed plans, as a proper reflection of the intent of the parties. Essentially, plaintiffs' counsel desires to be released from the terms of the confirmed plan because, in working extended hours to hammer out an agreement, he was tired, and inadvertently failed to include the terms of the purported stipulation in the plans of reorganization.

The existence and substance of the agreement is important because parties are permitted, as a matter of freedom of contract, to allocate payments on a judgment in a manner different than the presumptive rule of interest first. The plaintiffs have now conceded that they did agree to apply the Effective Date Payment to full payment of principal and to accept the money eventually deposited in the Escrow Account, together with earnings on that account, in lieu of interest at the 10 percent Arizona judgment rate that would otherwise have continued to apply to the Escrow Account on the theory that its contents were unpaid principal.

The argument raises what is fundamentally a question of fact for the bankruptcy judge: the terms of what was actually agreed in the proceeding that occurred before the judge. He understood the context and the positions of the parties and observed the "give and take." Because the bankruptcy court had a more complete record of the documents and negotiations between the parties, we do not conclude as a matter of fact or of law that the bankruptcy court erred in its conclusion that the plaintiffs agreed to accept interest accruing in the escrow account in lieu of interest at the state court judgment rate.

### III.

#### A.

Having determined that interest continued to accrue postpetition but that the payment of the judgment principal and the deposit into the escrow account stopped the accrual of interest on the judgment, the question becomes the applicable rate of interest.

The Ninth Circuit applies applicable state law interest rates absent federal preemption. Several courts have held that the state post-judgment interest rate applies in diversity jurisdiction. *See United States v. 1980 Lear Jet, Model 35A, Serial Number 277*, 38 F.3d 398, 401–02 (9th Cir.1994) (upholding Arizona's mechanics' lien law's pre and post-judgment interest rate of 10 percent per year); *International Telemeter. Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1494–95 (9th Cir.1985) (holding that state law governs interest rate on judgment in diversity case). Bankruptcy is no different.

Thus, Arizona's 10 percent interest rate continued to apply until the money was deposited into the escrow account. The bankruptcy court did not err in this respect.

#### B.

Finally, we note that postpetition interest on the principal owed on a judgment of a state court can be supported on three, independent theories that potentially apply in this case.

#### 1.

First, interest at the state's judgment interest rate is warranted, as here, when the peculiar circumstances of the judgment give it a character that transcends the status of a mere money judgment. We conclude in this appeal that the bankruptcy court was correct in concluding that this theory applies in this case.

#### 2.

Second, interest at the state's judgment interest rate continues to accrue postpetition on nondischargeable debts. *Cf. Bruning v. United States,* 376 U.S. 358, 360, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964) (Bankruptcy Act). Nondischargeability actions are still pending in the bankruptcy court. If the debts were to be held in that litigation to be nondischargeable (and the jury's verdict strongly suggests nondischargeability), then the interest that the bankruptcy court determined to be the amount required to be deposited into the escrow account under the plans of reorganization would have been calculated correctly even if our conclusion today affirming the bankruptcy court were to be subsequently reversed. And the plaintiffs' agreement to accept the escrow account in lieu of continued accrual of interest would, unless similarly reversed, continue to apply.

#### 3.

Third, postpetition interest at the federal judgment interest rate would apply to the extent that the individual bankruptcy estates are solvent estates. When available funds are sufficient to pay all claims and expenses in full, then interest must be paid in a chapter 7 liquidation at the legal rate from the date of the filing of the petition. 11 U.S.C. § 726(a)(5).[12]

Whether these estates are solvent remains an unresolved question that boils down to the effect of AMERCO's agreements to indemnify the debtors. If the

indemnification agreements are given full value for the amounts that AMERCO actually funded under the plan, then the bankruptcy estates (net of exempt assets) are solvent in the approximate amount of $106.25 million.

AMERCO, contending that the estates were insolvent, insists that its indemnification agreements were worthless and asserts that, during the original hearing on confirmation of the plans of reorganization (which plans the bankruptcy judge refused to confirm), it paraded in a number of witnesses who opined without contradiction that AMERCO was not able to make good on an indemnification obligation of $461.84 million. AMERCO persisted in this assertion on oral argument even though it did in fact manage to find a way to come up with the funds once the plans were confirmed.

The bankruptcy court does not appear to have made a formal finding on the question of the debtors' solvency and, in any event, would have been entitled to disbelieve AMERCO's opinion evidence. At the time of the actual confirmation of the consensual plans, this testimony would have been even more doubtful because AMERCO was actually paying the full amount of the judgment interest. That the bankruptcy judge did not think he had decided that question was evident in his ruling in the subsequent proceeding on the interest question when he began his analysis with the phrase, "Assuming arguendo that the debtors are insolvent." E.R. 01140, lines 4–5.

Thus, if the conclusion that Arizona's judgment interest rate applies is incorrect on either of the theories that are potentially applicable, then it would be appropriate to remand to the bankruptcy judge for a formal finding on whether the estates were solvent in order to determine whether interest was required to be paid postpetition at the federal judgment interest rate.

---

**12.** Although the statute refers to the "legal rate" of interest, it is commonly understood that this means the federal judgment rate. 6

COLLIER ON BANKRUPTCY ¶ 726.02[5] (Lawrence P. King, et al., eds., 15th ed. rev.1997).

## CONCLUSION

In sum, we AFFIRM the bankruptcy court's holding that defendants are required to pay postpetition interest to satisfy the stock surrender provision of the Arizona court judgment and its determination of the correct amount.

Similarly, we AFFIRM the bankruptcy court's holding that plaintiffs stipulated to accept the escrow account and interest accrued in the account in satisfaction of the Arizona court judgment.